684 So.2d 368 (1996)
STATE of Louisiana
v.
Glen SEALS.
No. 95-KA-0305.
Supreme Court of Louisiana.
November 25, 1996.
Rehearing Denied December 13, 1996.
*370 Martin Edward Regan, Jr., New Orleans, Richard Morris Tompson, Gretna, Nicholas Joseph Trenticosta, John Howard Holdridge, New Orleans, Glen E. Seals, Angola, James C. Lohman, Tallahassee, FL, for Applicant.
Richard P. Ieyoub, Attorney General, Jack M. Capella, District Attorney, Ronald David Bodenheimer, Terry Michael Boudreaux, Gretna, James Alan Williams, Metairie, for Respondent.
BLEICH, Justice.[*]
On August 15, 1991, the Jefferson Parish Grand Jury indicted Glen Seals for the first degree murder of Metry Cab driver Ray Feeney, in violation of La.R.S. 14:30. After proceedings conducted during the week of July 19, 1993, a twelve-person jury unanimously voted to convict the defendant Seals as charged. After the guilt phase of trial concluded, the same jury then considered evidence presented at the sentencing phase of the proceedings, held during the afternoon and evening hours of July 23, 1993. Having unanimously concluded that the state proved the aggravating circumstance of commission of murder during the perpetration of an armed robbery, the twelve members of the jury determined that the death sentence be imposed on Glen Seals.
The defendant now appeals his conviction and sentence to this Court arguing 11 of the 20 assignments of error filed below.

FACTS
Minutes before 11:00 p.m. on the evening of July 26, 1991, Coca-Cola employee Kevin Belile was driving home after his day's work. As he proceeded homeward, he spotted what appeared to be a shirtless man with blood on his chest lying on the ground on the roadside near the Clearview exit off the Earhart Expressway. Hoping to find law enforcement officers to alert, Belile proceeded to the Shoney's on Clearview Parkway near Elmwood, where he had often noticed Louisiana State Troopers congregated. When he saw there *371 were no police units in Shoney's lot, Belile proceeded to the Shell Station adjacent to Shoney's and used the pay phone to call 911.
After giving the 911 operator his name and reporting what he had seen, Belile returned to the scene to render assistance. When Belile cautiously approached the recumbent form he had seen he queried, "Are you all right?" The man lying on the roadside rolled over, beseeching help and saying, "I'm dying." Belile entreated the injured man to calm down and assured him that he had called the police and summoned an ambulance. When the victim asked for something to put his head on, Belile seized a torn brown paper bag full of documents which he saw nearby, which appeared to him to include a cab driver's trip records, and pulled it over to support the injured man's head.
Because he promptly asked the victim's name and received a response, Belile learned the injured man was Ray Feeney. Receiving an affirmative answer when he asked Feeney if he had been shot, Belile learned from further responses to additional questions that Feeney was a cab driver for Metry Cab Service. Belile asked Feeney if he had been robbed and Feeney gave an affirmative answer. Belile then asked Feeney if his assailant was a black man or a white man and the victim responded, "Black." Belile did not receive a response when he asked Feeney if the assailant mentioned a name, but when he asked Feeney what his assailant looked like and what age and height he appeared to be, Feeney reportedly gave a response stating his assailant was in his thirties and said the man was "five-feet-something." Belile asked about the assailant's hair style, prompting a response by querying, "Did he have a big Afro or short hair, short and tight?" Feeney responded, "Short." When Belile asked if the perpetrator had a mustache or any facial hair, Feeney said, "Mustache." Queried about what his assailant wore, and urged to say whether he had on a certain color shirt or pants, Feeney responded, "Red hat." Although Belile again questioned Feeney about the color of the assailant's shirt, he received no response and, at this point in his trial testimony, explained, "He [Feeney] couldn't give me an answer. He was kind of on and off." When the prosecutor asked Belile, "Where did you get the experience to ask these kinds of questions?" Belile said, "My dad retired from the N.O.P.D., 17 years, back in, I guess that was, '79 or '80."
After the first police officer arrived where Belile and Feeney were located, Belile jumped up off the ground, ran to the officer who was starting to use his radio, and promptly related the victim's name and occupation, the fact that he was shot, the assailant's departure in Feeney's cab, and the description of the assailant and his headgear. In turn, the information was broadcast over police radios.
At the time in question, off-duty Jefferson Parish Sheriff's Office Sgt. Ed Merida was monitoring his police radio as he proceeded from a paid detail to his residence. Because he stopped at a convenience store to buy milk on his way home, Merida's monitoring was intermittent, but he did hear of the shooting of a cab driver on the Earhart Expressway in a broadcast which described the perpetrator as a "Negro male" with a mustache, wearing a red cap Merida testified that he thereafter heard another broadcast relating the commission of an armed robbery and a vehicle theft involving a black male and a white four door Chevrolet Caprice cab. As Merida proceeded southbound on Causeway Boulevard, he noted that a white Chevrolet Caprice cab entered Causeway in front of him and also proceeded southbound. As Merida maneuvered his unmarked car to pull up even with this cab to a position from which he could see the driver and try to make eye contact, he noticed an African-American male passenger in the front seat who, as he pulled alongside and attempted to make eye contact, slumped down somewhat in the seat in a way which enabled Merida to see that he was wearing a red cap. Defendant Seals was the passenger whom Sgt. Merida observed.
Upon making these observations, Sgt. Merida slowed to position himself behind the cab and radioed headquarters to report his situation and request assistance. Thereafter, Sgt. Merida activated his flashing lights and siren, stopped the cab, and ordered both *372 occupants out of the vehicle. Sgt. Merida then observed a plastic bag in the front passenger side of the cab, filled with clothing which appeared to be bloodstained. Sgt. Merida testified that the defendant immediately attempted to discuss the reason for the stop and the contents of the bag in the front of the cab, explaining the clothing became bloodied as a result of a fight. Sgt. Merida testified that he told Seals he had no desire to talk with him in reference to what he observed and then advised Seals of his Miranda rights.
Among the back-up officers responding to Sgt. Merida's call for assistance was Sgt. Glenn Toca, who was then assigned to the armed robbery squad. After Sgt. Toca talked to Sgt. Merida and learned of bloody items located in the cab and blood on Glen Seals, Sgt. Toca addressed Seals, advising him of the Feeney investigation which he was conducting and again apprising him of his Miranda rights, which Sgt. Toca said Seals waived. Sgt. Toca testified that after he interviewed Seals at the scene of the Causeway Boulevard stop, Seals agreed to accompany law enforcement officers to the Detective Bureau in Harvey for a further interview. The interview led to a statement made at 2:15 a.m. in which defendant recounted his presence at a fight between his friend, a man named Shorty, and a Caucasian man who cut Shorty with a broken bottle for allegedly selling him "bunk" instead of drugs as an explanation of how the apparel he carried came to be bloodstained. The interview encompassed queries about the defendant's possession of a set of keys found in his pocket, keys the defendant claimed he did not recognize and which presence in his pocket he said he could not explain.
Jefferson law enforcement officials showed these keys to Michael Grayson, the owner of the cab Ray Feeney was leasing and driving at the time he was fatally shot. Mr. Grayson identified the keys as belonging to Feeney's Metry cab. Sgt. Toca testified that it was after learning the keys found in defendant's possession were the keys to Feeney's cab that he resumed interviewing defendant and sought the second statement. In giving the second statement, the defendant denied robbing Feeney, admitted he shot him, and insisted that he acted in self-defense.
The autopsy performed by pathologist Dr. Fraser MacKenzie revealed five gunshot wounds, two of which, wounds to the body, were the cause of Ray Feeney's death. There was one "grazing" facial gunshot wound and one gunshot wound to each hand. In his statement admitting the shooting, Seals claimed that when Feeney's cab, which he hired in Metairie, brought him to "Pigeon Town" in the Carrollton area and stopped there as he directed, he turned to look outside the cab at a person proceeding toward it whom he first thought was his friend, Shorty. After he saw the approaching person was not Shorty, Seals refocused his attention on the front of the cab and Feeney to find that Feeney had drawn his gun, was aiming at him, and ordered him to pay his fare and exit the cab. In this statement, Seals related that his response was to grab the gun and tussle with the driver in such a way that he vaulted into the front seat, after which time the gun went off and the driver was wounded.
Seals insisted this first shot did not faze Feeney[1], then related that from his new vantage in the driver's seat, he cranked the car and put it into gear. Seals asserted that Feeney renewed their tussle for the gun and killed the car's engine, ordering him to leave the cab. Seals related that he was determined not to get out, and gave a number of reasons for his resolve.
Seals' statement next recounted that he then drove down Earhart and his tussling over the gun with the cab driver resumed and resulted in the repeated discharge of the *373 gun. Seals related that when the cab arrived at the Clearview exit, Feeney opened the door to jump out, prompting Seals to apply the brakes. While the cab was still moving, Feeney did exit the cab and Seals continued to drive the cab, which now contained the gun he knew to be "empty" (because, before Feeney jumped, the gun "clicked", signifying to Seals that it did not contain any other bullets).
After going to his sister's neighborhood, abandoning the cab and discarding the gun, Seals visited his sister's home, where he washed himself and donned clean clothes. From this New Orleans East location, Seals called a White Fleet cab in which he traveled to Metairie with his bloodstained articles of apparel. It was this taxi which Sgt. Merida observed and stopped on Causeway Boulevard within a couple of hours of the shooting. After the completion of the interview which culminated in Seals' admissions, the Jefferson Parish Sheriff's Office personnel investigating the Feeney case arrested Seals and charged him with the first degree murder of which he now stands convicted.

DISCUSSION

SCOPE OF REVIEW
As in most capital cases, the defendant asserts numerous assignments of error which were not objected to during the trial. La. Code Crim.P. art. 841(A) and La.Code Evid. art. 103 require the contemporaneous objection, which advances the goal of judicial efficiency by preventing a defendant from gambling for a favorable verdict and then, upon conviction, resorting to appeal on errors which either could have been avoided or corrected at the time or should have put an immediate halt to the proceedings. Therefore, this Court follows the scope of review analysis of State v. Taylor, 93-KA-2201 (La.2/28/96), 669 So.2d 364. In Taylor, this Court held that the scope of review in capital cases is limited to alleged errors occurring during the guilt phase that are contemporaneously objected to, and alleged errors occurring during the sentencing phase, whether objected to or not.

Specific Intent
In its first error assignment, the defense argues that the trial evidence was constitutionally insufficient under state and federal law in all respects, urging that no rational trier of fact could have found guilt beyond a reasonable doubt. Specifically, the appellant asserts that there was insufficient evidence of the requisite criminal intent and insufficient evidence that appellant committed an armed robbery, primarily basing his arguments on the version of events for which defendant contended in both his 3:22 a.m. statement on July 27, 1991 and his trial testimony of July 22-23, 1993.
An appellate court reviewing a claim of insufficient evidence must determine that the trial evidence, whether direct or circumstantial, or a mixture of both, viewed in the light most favorable to the prosecution, was sufficient to convince a rational trier of fact that all of the elements of the crime have been proven beyond a reasonable doubt. Jackson v. Virginia, 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979); State v. Jacobs, 504 So.2d 817 (La.1987). There are two elements of the charged first degree murder on which defendant focuses in his insufficiency challenge: specific intent to kill or inflict great bodily harm and commission of armed robbery.
La.R.S. 14:10(1) defines specific criminal intent as "that state of mind which exists when the circumstances indicate that the offender actively desired the prescribed criminal consequences to follow his act or failure to act." Intent is a question of fact. Nevertheless, the intent at issue in this case, specific criminal intent, need not be proven as a fact, but may be inferred from the circumstances of the transaction and the actions of the defendant. State v. Maxie, 93-2158 (La.4/10/95), 653 So.2d 526. On more than one occasion, this Court has held that specific intent to kill may be inferred from a defendant's act of pointing a gun and firing at a person. State v. Williams, 383 So.2d 369 (La.1980); State v. Procell, 365 So.2d 484 (La.1978).
*374 The denominations of the money depicted in the three photographic exhibits[2] showing the bloodied bills constitute graphic evidence which the jury could have considered proof that Seals acquired this money by robbing the cab driver he admitted he shot. It would seem to be common knowledge that a cab driver is a worker whose occupation fairly calls for the possession of reasonable amounts of small bills to make change for his fares.[3] The defense errs in its argument that Belile's recounting of Feeney's statement that a robbery occurred is the only evidence of the commission of a robbery.
Belile testified that Feeney stated his assailant robbed him while Seals maintained he did not. Seals testified that the firing of the weapon ascribed to him resulted from his efforts to defend himself. Circumstantial evidence, not the least of which is the number of shots fired and the wounds inflicted on Feeney (five shots in all), points to the presence of specific intent to kill or inflict great bodily harm. The jury confronted serious questions of credibility. Their verdict evidences their rejection of the defendant's story.
As this Court noted in State v. Mussall, 523 So.2d 1305 (La.1988), credibility choices made by the jury are not immune from review simply because the record tends to support each element of the crime. When circumstantial evidence is used to prove the commission of an offense, La.R.S. 15:438 requires that "assuming every fact to be proved that the evidence tends to prove, in order to convict, it must exclude every reasonable hypothesis of innocence." In circumstantial evidence cases, when the jury reasonably rejects the hypothesis on innocence offered by the defendant in his own testimony, "that hypothesis fails, and the defendant is guilty, unless there is another hypothesis which raises a reasonable doubt." State v. Captville, 448 So.2d 676, 680 (La.1984). If rational triers of fact could disagree as to the interpretation of the evidence, the rational trier's view of all the evidence most favorable to the prosecution must be upheld. Mussall, 523 So.2d at 1310. However, if the appellate court finds that no rational trier of fact viewing all the evidence from a pro-prosecution standpoint could have found guilt beyond a reasonable doubt, the conviction cannot constitutionally stand. Id.
Given the evidence supporting a conclusion that an armed robbery took place, the contradictions and embellishments of defendant's trial testimony, and the admitted fact that the first statement he gave the police consisted entirely of lies, the jury viewed and heard ample evidence to justify its rejection of Seals' "somewhat plausible" hypothesis of innocence/defense of self-defense. The evidence was sufficient to show that the defendant committed an armed robbery and possessed specific intent to kill or inflict great bodily harm when he repeatedly shot Ray.
This court concludes that there was constitutionally sufficient evidence of the disputed elements of first degree murder and constitutionally sufficient evidence to justify the rejection of Seals' claim of self-defense. Review of this record refutes the defense assertion that no rational trier of fact could have found Seals' guilt beyond a reasonable doubt. The trial evidence satisfied the constitutional standards. This assignment of error lacks reversible merit.

Voir Dire Issues

Peremptory Challenges
During voir dire, the defense objected to the prosecution's peremptory challenges based on Batson v. Kentucky, 476 U.S. 79, 106 S.Ct. 1712, 90 L.Ed.2d 69 (1986). The defense alleged that the prosecutor's challenges to the three jurors were racially motivated.
*375 In courts of our state, as well as in federal courts in this circuit, eye contact (or lack of it), body language, and other sense impressions appear to be recognized as important factors in decisions to exercise peremptory challenges.[4] Since the United States Supreme Court announced its decision in Purkett v. Elem, ___ U.S ___, 115 S.Ct. 1769, 131 L.Ed.2d 834 (1995), it is undisputed that the reasons given for exercising a peremptory challenge need only be plausible. State v. Green, supra, 655 So.2d at 288.
The reasons the prosecutor gave for seeking to challenge Jackson, Hester, and Cook were all plausible and were not racially motivated. Defense counsel did not attempt to dispute this assessment and the trial judge's mute acceptance of it shows that it was factually based. In any event, the burden of proving purposeful racial discrimination rested with the defendant, and he has not met his burden.

Challenges for Cause
Defense counsel argues that the trial court erred in denying challenges for cause issued on defendant's behalf against prospective jurors Wayne Hauck and Eric Simon, which caused defendant to be denied his constitutional right to the full use of his peremptory challenges when he was required to exercise two of his challenges to excuse Hauck and Simon as potential jurors.
When the panel of prospective jurors of which Hauck was a member was asked if any one of them, or any close friend or relative, had been the victim of a violent crime, Wayne Hauck was one of the jurors who responded, stating, "My grandfather was killed in a holdup when I was three years old. He was a taxi driver. It was an armed robbery. And that's it as far as the first question." Hauck's response prompted the prosecutor to probe, "Do you think what happened to you would keep you from giving Glen Seals a fair trial if you are selected as a juror in this case?" Mr. Hauck responded, "No. Because first of all, Glen Seals is not the man who killed my grandfather; and, second, of all, I was too young. I don't remember him. I don't hold that against anybody else." The prosecutor explained the purpose of his query, saying, "The reason that I asked that is some people indicate that maybe they want to get even for something that happened to them. I take it you wouldn't do that, at all?" Hauck answered, "No, I wouldn't."
Later, Defense counsel asked, "And in terms of deciding and looking at the particular individual who, in fact, died as a result of this situation, would you separate your grandfather in your image or thoughts of a grandfather on this gentleman and make a fair decision based on what happened at the time." Hauck responded, "Yes, I could." Defense counsel restated his question, "Can you do that?" Mr. Hauck responded, "Yes."
Defense counsel challenged for cause. The trial judge declined to grant the challenge for cause, stating, "I took special note to his answer and watched his demeanor, and I couldn't excuse him for cause, because I think by his answers and his demeanor that he could be fair and serve as a juror."
During voir dire, prospective juror Simon revealed he had a problem with deadly force in self-defense. Defense counsel posed a hypothetical where the one defending himself was not an aggressor, but merely responding to an attack on his life; prospective juror Simon stated he had a problem with the use of deadly force in self-defense even when there is a chance that the defendant could be killed. Simon opined that the only time deadly force in self-defense would be appropriate is during time of war, going so far as to express his feeling that even when the law allows the use of deadly force he did not feel it was justified. Having elicited these views from prospective juror Simon, the defense issued a challenge for cause. When the prosecutor made a request, the trial court permitted him to examine *376 Simon further on the issue. After a query from the prosecutor, Simon opined that reasonable force could never be deadly force. Thereafter, the prosecutor asked Simon if he could accept the principle of law that allows deadly force to be reasonable in some situations and Simon responded that he could accept the principle if the law allowed it. The trial judge sought to focus the inquiry, explaining, "It's not what you might think, personally, but can you accept the principle of law that a person has a right to defend himself and use the force that might be necessary? You might not do that yourself, but" Simon responded, "If the law says so, yes, I could." The prosecutor then asked for and was granted permission to inquire. He said:
The law isI'm going to tell you what the law is. It says you can kill somebody in self-defense only if you reasonably believe that he is about to kill you and by using deadly force is the only way to save yourself. And it's a reasonable person's standard. That's it. The only time you can kill in self-defense is if, at that very moment, you feel like you are about to be killed or receive great bodily harm. That's the only time, in Louisiana law, when you can use deadly force in self-defense. That's what the Judge will tell you, I'm certain, at the end of the trial.
The trial judge asked Simon, "Can you accept that principle and follow it?" Simon responded, "Oh, yes. That's a principle I can accept."
Having elicited this response, the prosecutor opposed the defense's challenge for cause, the trial court refused to excuse Simon for cause, and the defense peremptorily challenged Simon.
Hauck's responses on the issue of whether he might harbor any bias against the defense based on the murder of his cab driver grandfather when he was three years old establish as fact that his certainty that he possessed the ability to judge fairly was unqualified and unwavering, justifying the trial judge's exercise of his broad discretion to deny the defense's cause challenge of Hauck. Because the defense has not succeeded in pointing out where the voir dire discloses an abuse of discretion in the trial judge's ruling, this complaint does not warrant relief from this Court. The trial judge did not abuse his discretion in denying the challenge for cause as to the prospective juror Simon. Clearly, the prospective juror demonstrated his ability to apply the law as it is written. Thus, this error lacks merit. We conclude that the voir dire in the instant case more than adequately fulfilled the purposes of La. Const. art. I, § 17.

Prosecutorial Comments
The defendant argues that comments made by the prosecutor during various stages of the trial taken (if they do not warrant a reversal individually) together as a whole warrant a reversal of the decision of the trial court.
This Court has considered the issue of whether the cumulative effect of a number of allegedly improper statements by the prosecutor during penalty phase closing argument warranted relief. In State v. Scales, 93-2003 (La.5/22/95), 655 So.2d 1326, 1335, this Court concluded that the cumulative effect of various comments did not deprive defendant of a fair trial.[5]
After reviewing the record and all the statements made during the trial, in context and alone, we are firmly convinced that the jury was not influenced by them and that they did not contribute to the verdict. This assignment of error is without merit.

Victim Impact Evidence
The defendant contends that the defendant was denied his right to a fair trial and to a reliable capital sentencing proceeding by the saturation of his trial, at both phases, by irrelevant prejudicial victim impact evidence.
During presentation of evidence during the guilt phase the prosecutor queried Ray Feeney's widow about his employment prior to the time he became a cab driver, and asked whether it was his intention to resume *377 work in the steamship business, his previous line of work. In her testimony, Mrs. Feeney mentioned that her husband had brought her a fish dinner just hours before he was slain, commenting that he did so every Friday because she especially liked fish. The defense argues testimony about former employment, job prospects, and fish dinners was irrelevant, suggesting that Mrs. Feeney's further testimony representing her husband as fearless was highly prejudicial, inadmissible, and suggestive of the impossibility that the victim could have felt threatened and so drawn a gun on Seals. The defense also complains that Mrs. Feeney's fainting spell, and the penalty phase testimony that both she and Drionne Armantrout, Mr. Feeney's step-daughter, gave created an undue risk of interjection of arbitrary factors at defendant's capital sentencing hearing.
The standards for admissibility of victim impact testimony in capital trials have varied greatly in recent years. In State v. Bernard, 608 So.2d 966 (La.1992), in our most detailed treatment of the subject we held:
Some evidence of the murder victim's character and of the impact of the murder on the victim's survivors is admissible as relevant to the circumstances of the offense or to the character and propensities of the offender. To the extent that such evidence reasonably shows that the murderer knew or should have known that the victim, like himself, was a unique person and that the victim had or probably had survivors, and the murder nevertheless proceeded to commit the crime, the evidence bears on the murderer's character traits and moral culpability, and is relevant to his character and propensities as well as to the circumstances of the crime. Id. at 972.
However, we went on to caution that:
[I]ntroduction of detailed description of the good qualities of the victim or particularized narrations of the emotional, psychological and economic sufferings of the victim's survivors, which go beyond the purpose of showing the victim's individual identity and verifying the existence of survivors reasonably expected to grieve and suffer because of the murder, treads dangerously on the possibility of reversal because of the influence of arbitrary factors on the jury's sentencing decision. Whether or not particular evidence renders a hearing so fundamentally unfair as to amount to a due process violation must be determined on a case-by-case basis. Id.

Also, this Court noted the Supreme Court's consistent holding that, "[e]vidence of the victim's survivors' opinions about the crime and the murder is clearly irrelevant to any issue in a capital sentencing hearing." Id. at 970.
Assuming, but not deciding, that this testimony exceeded the boundaries set forth in Bernard, any possible error was harmless. An error is harmless if the verdict rendered was surely unattributable to the error. La. Code Crim.P. art. 921; State v. Taylor, 93-KA-2201, (La.2/28/96), 669 So.2d 364, 371; State v. Johnson, 94-1379, (La.11/27/95), 664 So.2d 94, 100, citing Sullivan v. Louisiana, 508 U.S. 275, 113 S.Ct. 2078, 124 L.Ed.2d 182 (1993). This Court has previously applied the harmless error standard to a victim impact witnesses' comments on the appropriateness of the death penalty. State v. Taylor, supra; State v. Rushing, 464 So.2d 268 (La.1985), cert. denied, 476 U.S. 1153, 106 S.Ct. 2258, 90 L.Ed.2d 703 (1986).
Our review of the victim impact testimony in this case indicates that it falls within the Bernard guidelines. Their descriptions of the good qualities of the victim were not overly detailed. We find that any possible error created by the admission of this victim impact evidence was harmless, and it does not warrant reversal of the sentence.
There remains the issue posed by the fainting spell of Mrs. Feeney. The defense maintains it mandated a mistrial, while the state argues that it is a matter of no evidentiary value, and that it cannot be shown to have had a cause and effect relationship on the penalty which the jury determined Seals would face. After Mrs. Feeney fainted, the state strongly maintained that the drama had not been staged. The defense has neither attempted to refute this claim, nor intimated that Mrs. Feeney did (or failed to do) anything which brought about this occurrence.
*378 In State v. Newman, 283 So.2d 756 (La. 1973), this Court reviewed the denial of a defense motion for mistrial made when there was a hysterical outburst by a child witness in a burglary trial. The opinion sets forth that neither the spontaneous conduct of a witness, nor his unsolicited statements, are usually grounds for mistrial. In the Newman case, the Court observed that the judge denying the mistrial stated that crying was not unexpected by jurors in light of the age of the witness and the circumstances, and that in all probability it would happen again in the event of retrial.
The jury surely regarded the testimony of these victim impact witnesses as normal human reaction to the death of a loved one. The fainting was harmless error and of no evidentiary value and does not warrant a reversal of the verdict.

Exculpatory Evidence
In this assignment, the defense claims that the state deliberately withheld material exculpatory evidence in violation of Brady v. Maryland, 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963) and its progeny. The defense focuses on the state's late disclosure of a brown paper bag containing various documents and objects which the prosecutor initially seemed unable to find, and its failure to provide the 911 log showing the time Kevin Belile's 911 call was received, the time police were dispatched, and the time police first arrived at the scene where Feeney was lying on the roadside of the Earhart Expressway's Clearview exit.
When the prosecution produced the brown paper bag and its contents mid-trial, the defense sought a mistrial based on the late disclosure, but before obtaining a ruling on his motion Seals' counsel entreated, "I need time." The trial court denied the motion for mistrial, then addressed the assertion of a need for time, asking defense counsel how much time he needed. Defense counsel stated he hoped to have "at least an hour and a half to two hours" and the court announced that it would give the defense an hour, prompting the defense attorney to thank the court.
At the conclusion of the recess the trial judge noted that about an hour and a half or two hours had elapsed. Defense counsel announced his assessment of the bag and its contents. Based on his view that it was totally consistent with his theory of the defense, defense counsel announced that he would therefore need additional witnesses. The court instructed defense counsel to make a list of those witnesses, stating: "... [T]he Court will cooperate with you any way it can to get those witnesses in to present your case." Various witnesses were called by the defense to testify, including the Jefferson Parish forensic biologist who examined and tested the bag and the Jefferson Parish firearms examiner who examined items of evidence which included evidence contained in the bag.
La.Code Crim.P. art. 729.5 prescribes sanctions for failure to honor a discovery right, leaving in the trial judge's discretion the decision of whether to order a mistrial or enter any such other order as may be appropriate. Exercising his discretion, the trial judge recessed trial to give the defense the time defense counsel believed was needed to examine the bag and its contents. At the end of the recess, when defense counsel announced that his examination made him aware of the need for additional witnesses, the trial judge was accommodating.
In view of the foregoing, the defense has failed to show that it suffered any prejudice as a result of the belated release of the bag and its contents.
Argument on this assignment also focuses on the state's failure to provide the defense with the recently obtained 911 log, which showed the amount of time Belile had to converse with Feeney before Feeney died. Based on Belile's opportunity to learn from the dying Feeney what occurred and who was responsible, the defense advances a theory that Feeney actually told Belile nothing. The defense states that the 911 log is favorable and material evidence relating to the credibility of Kevin Belile which the prosecution had a duty to disclose.
The prosecutor may not suppress evidence which is favorable to the accused and material to either guilt or punishment. Brady v. Maryland, supra; State v. Sullivan, *379 596 So.2d 177 (La.1992). Favorable evidence includes both exculpatory evidence and evidence impeaching the testimony of a witness when the reliability or credibility of that witness may be determinative of defendant's guilt or innocence, or when it may have a direct bearing on the sentencing determination of the jury. United States v. Bagley, 473 U.S. 667, 105 S.Ct. 3375, 87 L.Ed.2d 481 (1985); Giglio v. United States, 405 U.S. 150, 92 S.Ct. 763, 31 L.Ed.2d 104 (1972). When Brady matter is withheld, a defendant is entitled to a new trial only if the evidence is "material." Evidence is material "if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different. A `reasonable probability' is a probability sufficient to undermine confidence in the outcome." United States v. Bagley, supra, at 678, 105 S.Ct. at 3381.
There is nothing to indicate, much less establish, a reasonable probability that had this allegedly suppressed evidence been turned over, the result of the proceeding would have been different. This assignment of error lacks reversible merit.

Motion to Suppress Defendant's In-Custody Statements
The defendant argues that the trial court erred in ruling that defendant's in-custody statements were made freely and voluntarily and in denying his motion to suppress the statements.
The argument initially focuses on the trial court's acceptance of Sgt. Merida's testimony. Defendant argues that Sgt. Merida's assertion that he saw the mustached defendant wearing a red cap is unworthy of credibility, in light of the testimony of Sgt. Toca, White Fleet driver Burbank, and the defendant, himself. Apparently taking the quantitative approach to weighing credibility, the defense asserts that Merida, contrary to his sworn testimony, did not see defendant wearing the red cap when he decided to stop the White Fleet cab.
The defense insists Merida had no legitimate reason to stop the White Fleet cab on Causeway Boulevard, concluding the stop was pre-textual in nature and, thus, illegal. Next, the defense claims there was pre-Miranda interrogation of the defendant, also discounting Sgt. Merida's testimony that he promptly advised the defendant of his rights even as Seals demonstrated a desire to "talk immediately," to explain why he had bloody clothes. The defense insists that the White Fleet driver's testimony that questioning by Sgt. Merida took place should be accepted, despite defendant Seals' own testimony at the motion hearing to the contrary.
The defendant argues that he suffered substantial harm as a result of the admission of Seals' station house statements on July 27, 1991, asserting that the statements' contents so undermined the credibility of his crucial trial testimony that, had they not been admitted, the result of the proceeding would have been different. The defense concludes that the defendant's statements were not freely and voluntarily made.
A law enforcement officer's right to stop and interrogate one reasonably suspected of criminal activity is recognized by La. Code Crim.P. art. 215.1 as well as by state and federal jurisprudence. Terry v. Ohio, 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968); State v. Davis, 92-1623 (La.5/23/94), 637 So.2d 1012. In the Davis opinion, this Court acknowledged that the right to make an investigatory stop must be based on sufficient knowledge justifying a belief that the person being stopped has been or is about to be engaged in criminal conduct. What Sgt. Merida knew, combined with what he observed when the White Fleet cab caught his attention, constituted the degree of information necessary to justify the investigatory stop he conducted. Sgt. Merida's suspicions were strengthened when he viewed the bloody defendant and his bloody possessions in a plastic grocery bag on the passenger side of the front of the cab. Sgt. Merida's testimony provided ample evidence that Seals was given the proper Miranda warnings at the scene of the stop.
From the observations about hearing testimony interspersed among the arguments of defendant's claims, it is clear that there is no persuasive basis for finding Merida's stop of the White Fleet cab pre-textual, no compelling *380 reason why Sgt. Merida's assertion that he "Mirandized" Seals should not be accepted, no reason for concluding there was mistreatment of any party, or promises or threats which prompted Seals to give his statements. Sgt. Merida's testimony established he heard the description of a black mustached man wearing a red cap broadcast in connection with an armed robbery-murder report involving a cab. His sighting of defendant, a mustached black male wearing a red cap and riding in a cab, constituted reasonable cause to justify an investigatory stop, especially because he observed defendant slouch in his seat when they made eye contact.
The state's burden of proving the free and voluntary nature of a confession as a condition precedent to its admission into evidence is codified in La.R.S. 15:451 and La. Code Crim.P. art. 703 D. This Court's review must be deferential to the trial court's findings unless it finds the ruling inadequately supported by reliable evidence. State v. Green, 94-0887 (La.5/22/95), 655 So.2d 272. The defense's complaint of the trial court's acceptance of Sgt. Merida's testimony fails to establish the inadequacy of the evidence supporting the trial court's conclusions. The defense's efforts to discredit evidence which refutes claims of inadequate grounds for an investigatory stop, interrogation prior to the giving of Miranda warnings, and coercion, fall far short of establishing that the trial court lacked reliable evidence upon which to base its ruling. It is clear that the trial judge found credible the testimony of those witnesses whose representations supported adequate grounds for the stop, timely Miranda warnings, lack of coercion and lack of promises. This Court recognizes its obligation to apply a standard of review which requires it to leave undisturbed a trial court's conclusions as to the credibility of witnesses and the weight of testimony relating to the voluntary nature of a confession unless they are not supported by the evidence. State v. Sanders, 93-0001 (La.11/30/94), 648 So.2d 1272 at 1282. By this standard, the Court finds this assignment of error lacking in merit.

Sentencing
The defense urges that the trial judge committed reversible error when he failed to wait twenty-four hours between denial of the motion for new trial and imposition of sentence. The defense bases its claim on La.Code Crim.P. art. 873, which provides: "If a defendant is convicted of a felony, at least three days shall elapse between conviction and sentence. If a motion for a new trial, or in arrest of judgment, is filed, sentence shall not be imposed until at least twenty-four hours after the motion is overruled. If the defendant expressly waives a delay provided for in this article or pleads guilty, sentence may be imposed immediately."
The mandatory nature of the sentence of death distinguishes this case from the State v. Augustine, 555 So.2d 1331 (La.1990), where there was to be a decision by the trial judge on the term of years to be imposed. Delay or no delay, the sentence the judge was required to impose would have been the same. Thus, no prejudice could possibly have resulted from the failure of the court to comply with the delay. The defendant and his counsel were asked if they were ready for sentence to be imposed and whether defendant wished to address the court. Defense counsel asserted that the defendant had nothing to say. Absent a showing that prejudice resulted from the failure to afford the statutory delay, reversal of the prematurely imposed sentence is not required. State v. White, 404 So.2d 1202 (La.1981).[6] Hence, this error lacks merit.

Sentence Review
Article 1, § 20 of the Louisiana Constitution prohibits cruel, excessive, or unusual punishment. Under La.Code Crim.P. art. 905.9, this Court reviews each death sentence imposed by the courts of this state to determine if it is constitutionally excessive. The criteria for review are established in La.Sup. Ct.R. 28, § 1, which provides:

*381 Every sentence of death shall be reviewed by this court to determine if it is excessive. In determining whether the sentence is excessive the court shall determine:
(a) whether the sentence was imposed under the influence of passion, prejudice, or other arbitrary factors, and
(b) whether the evidence supports the jury's finding with respect to a statutory aggravating circumstance, and
(c) whether the sentence is disproportionate, considering both the crime and the defendant.

(a) Passion, Prejudice, or Any Other Arbitrary Factors
In the defense's formal assignments of error [7], the defense asserts the jury's determination of sentence was the result of passion, racial prejudice, arbitrariness and caprice. In capital cases the Court has heightened responsibility to determine whether argument introduced passion, prejudice, or other arbitrary factors which contributed to the jury's sentencing decision. Upon reviewing the record, we find no evidence of racial prejudice in this jury. Each jury member declared during voir dire that race would not influence his decision during sentencing. Furthermore, we have considered earlier in the opinion any possibilities in this area which could constitute reversible error. We conclude that there is nothing to establish that passion, prejudice, and/or other arbitrary factors were interjected into these proceedings in such a way that they contributed to the jury's decision that Seals should suffer the death penalty.

(b) Statutory Aggravating Circumstances
As noted earlier in this opinion, the state introduced more than sufficient evidence to prove the presence of the aggravating circumstance of armed robbery. Armed robbery is the taking of anything of value from the person of another or that is in the immediate control of another, by use of force or intimidation, while armed with a dangerous weapon. La.R.S. 14:64.

(c) Proportionality
Federal Constitutional law does not require a proportionality review. State v. Scales, 92-2003 (La.5/22/95), 655 So.2d 1326. Nonetheless, La.Sup.Ct.R. 28, § 4(b) provides that the district attorney shall file with this Court a list of each first degree murder case tried after January 1, 1976, in the district where the sentence is imposed. Fifty-five cases were cataloged, all first degree murder cases in the 24th Judicial District Court in which sentence was imposed after January 1, 1976. Of the fifty-five cases, which include the prosecution of the defendant in these proceedings, eight appear to involve trials for first degree murder in armed robbery situations uncomplicated by issues of drugs or sex. Of those eight trials the jury returned verdicts of guilty of first degree murder in six, and determined that the defendant should be sentenced to death in five of the six, opting to have a life sentence be the punishment only in the case of Joel Durham, the youthful murderer of an equally youthful manager of a McDonald's restaurant.
The first of the five cases is that of Benjamin Berry, who fatally shot a law enforcement officer during a bank robbery. Berry was executed in 1987. State v. Berry, 391 So.2d 406 (La.1980); cert denied, 451 U.S. 1010, 101 S.Ct. 2347, 68 L.Ed.2d 863 (1991). The second of the five cases is that of Tyronne Lindsey, who killed a shopper in the Oakwood Mall parking lot. After numerous resentencings and a retrial, Lindsey is once again sentenced to death. State v. Lindsey, 543 So.2d 886 (La.1989); cert denied, 494 U.S. 1074, 110 S.Ct. 1796, 108 L.Ed.2d 798 (1990). The third of the five cases is that of Jimmy Robinson who killed the husband of an apartment complex manager in her presence during an armed robbery. This Court affirmed the conviction but vacated the death sentence and, on remand, Robinson was given a life sentence. State v. Robinson, 421 So.2d 229 (La.1982). The fourth of the five cases is that of Johnny Taylor, who stabbed to death David Vogler, a man whom he lured to a shopping center parking lot on the pretext *382 of wanting to buy a car Vogler offered for sale. State v. Taylor, 422 So.2d 109 (La.1982); cert denied, 460 U.S. 1103, 103 S.Ct. 1803, 76 L.Ed.2d 367 (1983).
The death penalty for the crime of first degree murder of Ray Feeney imposed on this (now) thirty-three year old defendant, Glen Seals, is not shown to be a disproportionate sentence, nor does it appear to be such. The defendant shot the victim five times in his own taxi cab during the course of an armed robbery. We conclude that the death penalty imposed in this case is not disproportionate to the penalty imposed in similar cases, considering both the crime and the defendant.

DECREE
For the reasons assigned, the defendant's conviction and sentence are affirmed for all purposes except that this judgment shall not serve as a condition precedent to execution, as provided by La.R.S. 15:567, until: (a) the defendant fails to petition the United States Supreme Court timely for certiorari; (b) that Court denies his petition for certiorari; (c) having filed for and been denied certiorari, the defendant fails to petition the United States Supreme Court timely, under their prevailing rules, for rehearing of denial of certiorari; or (d) that Court denies his application for rehearing.
VICTORY, J., concurs.
NOTES
[*] Calogero, C.J., not on panel, Rule IV, pt. 2, § 3.
[1] During his trial testimony, Seals recounted a story in significantly greater detail and with some arguably significant differences. At trial, Seals related the first shot occurred when he was still in the back seat and claimed the bullet hit somewhere in the back of the vehicle. This change seems to dovetail neatly with the fact of the discovery of a bullet jacket on the back floorboard of the cab, a discovery of which Seals would have been unaware when he gave his July 27, 1991, 3:22 a.m. statement. During that statement, Seals responded to Toca's question seeking to learn if the first shot hit Feeney by stating, "Yeah, ... I'm more than sure that it hit him."
[2] The three photographic exhibits depict five (5) five-dollar bills and twenty-five (25) one-dollar bills, which totaled fifty (50) dollars. These exhibits presented graphic evidence to be weighed with Belile's testimony that Feeney stated he had been robbed.
[3] The jury heard testimony from Mrs. Feeney that tended to establish that Mr. Feeney had money with him on the evening in question and from Feeney's dispatcher that indicated he had several paying fares during the afternoon and during the evening in question. In addition to money, Feeney's cab, gun, and keys were taken after appellant shot five times in what he claimed was self-defense.
[4] See, e.g., State v. Johnson, 621 So.2d 1167 (La. App. 2nd Cir.1993), writ denied, 626 So.2d 1178 (La.1993) (venireperson who failed to maintain eye contact); State v. Young, 613 So.2d 631 (La. App. 1st Cir.1992), writ denied, 626 So.2d 1186 (La.1993) (venireperson appeared inattentive and "not too bright"); United States v. Cartlidge, 808 F.2d 1064 (5th Cir.1987) (venireperson who failed to make eye contact).
[5] State v. Copeland, 530 So.2d 526, 545 (La. 1988); State v. Graham, 422 So.2d 123, 137 (La.1982).
[6] The Official Revision Comment to Article 873 clearly expresses that the delays provided are for the purpose of preparing and submitting motions which must be filed and disposed of prior to sentencing.
[7] This assignment of error was not argued.