| .FITZSIMMONS, J.
(on rehearing).
The affirmation of the trial court conviction and sentence of Ricky Fugler is considered by this court pursuant to the grant of a rehearing. Ricky Fugler was charged by grand jury indictment with one count of attempted first degree murder, a violation of La. R.S. 14:27 and La. R.S. 14:30. He pled not guilty. After a jury trial, the defendant was found guilty as charged. He was sentenced to fifty years at hard labor. The First Circuit Court of Appeal affirmed the conviction and defendant’s sentence; however, we subsequently granted the instant rehearing. See State v. Fugler, 97-1936 (La.App. 1st Cir.9/25/98); 721 So.2d 1.
Having received and reviewed the arguments by the parties, and considering the attendant law, we now uphold the opinion originally issued by this court. On rehearing, however, that portion of the appellate opinion that addresses the issue of the Brady challenge relative to the taped statement by Su’jitra Moore is revised to read as follows:

Moore’s taped statement.

Louisiana Code of Criminal Procedure article 729.5 prescribes sanctions for failure to honor a discovery right. As pertinent here, La. Code Crim. P. art. 775 provides that a mistrial shall be ordered when prejudicial conduct in or outside the courtroom makes it impossible for the defendant to obtain a fair trial. However, a mistrial is a remedy which should be *895 granted only when the defendant suffers such substantial prejudice that he has been deprived of any reasonable expectation of a fair trial. Determination of whether a mistrial should be granted is within the sound discretion of the trial court, and the denial of a motion for a mistrial will not be disturbed on appeal without abuse of that discretion. State v. Berry, 95-1610, p. 7 (La.App. 1st Cir.11/8/96); 684 So.2d 439, 449; writ denied, 97-0278 (La.10/10/97); 703 So.2d 603.
In the instant case, after the State disclosed to the court that it had discovered Moore’s previously taped statement, and waived any objection to the court reviewing it for contradictions between it and Moore’s testimony at trial, the defense responded, “That’s fíne with me, Judge, ....”[1] The next day the defense supplemented its grounds for a mistrial, stating that the failure to disclose the existence of Moore’s taped statement compromised its ability to confront and cross-examine the witnesses. The defense acknowledged that the court had permitted it to review a portion of the statement, particularly the portion alleged to be Brady material, concerning the defendant’s hair. |sThe State argued that if the reference to the defendant’s hair on the taped statement was Brady material, it only became so after Moore’s testimony at trial. The defense also acknowledged that it had the opportunity to, and the court had suggested that it, re-call Moore to the stand and question her about her taped statement, but did not wish to do so “for tactical and strategic reasons.” Ultimately, the court denied the motion for a mistrial, and the defense objected to the court’s ruling.
The prosecutor may not suppress evidence which is favorable to the accused and material to either guilt or punishment. Brady v. Maryland, 373 U.S. 83, 87, 83 S.Ct. 1194, 1196-1197, 10 L.Ed.2d 215 (1963). Favorable evidence includes both exculpatory evidence and evidence impeaching the testimony of a witness when the reliability or credibility of that witness may be determinative of defendant’s guilt or innocence, or when it may have a direct bearing on the sentencing determination of the jury. United States v. Bagley, 473 U.S. 667, 676, 105 S.Ct. 3375, 3380, 87 L.Ed.2d 481 (1985); Giglio v. United States, 405 U.S. 150, 154, 92 S.Ct. 763, 766, 31 L.Ed.2d 104 (1972). When Brady matter is withheld, a defendant is entitled to a new trial only if the evidence is “material.” Evidence is material “if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different. A ‘reasonable probability’ is a probability sufficient to undermine confidence in the outcome.” Bagley, 473 U.S. at 682, 105 S.Ct. at 3383. State v. Seals, 95-0305, pp. 14-15 (La.11/25/96); 684 So.2d 368, 378-79, cert. denied, 96-7968 (La.4/28/97); 520 U.S. 1199,117 S.Ct. 1558, 137 L.Ed.2d 705.
The court must use caution in its treatment of Brady challenges. The whole question of what is at issue in the trial of any citizen is not measured in hard and fast terms that contain legalisms. Rather the mark of our judicial system is that of “fairness.” Unfortunately, that concept, and its true significance, is becoming clouded in a plethora of “standards” that seek to define a process. Yet, it would seem that many in our profession fail to understand the ebb and flow of a case being tried before a jury. The “opportunity” to “recall” a witness to cure a “problem” due to lack of disclosure by the opposing party does not correct the irreparable damage to the momentum of the presentation of a case. Sudden, belated revelations by the prosecutor can cause the rupture and rack of the defense’s course of action, which thereby impede the very theory of the defense’s case.
*896 To be fair means to seek to excel in the quest to abide by the rule; it more fully inheres the intent that this concept called “fair” be honored. The implicit condonation, or apparent |4excusal, by the court of the prosecutor’s failure to comply with the Brady requirements is disturbing to that sense of fairness.
In the matter sub judice, however, it is the existence of overwhelming evidence, i.e., the compelling testimony of the actual shooting, that supercedes the impact that Moore’s reference might have had to the outcome of the trial. Thus, the conviction and sentence appear to be proper in the final analysis, based upon the specific facts in this case.
The particular evidentiary facts reveal that the State presented Officer Perry’s identification of the defendant as the shooter. Officer Perry testified that after he pursued the defendant and his truck into the Wal-Mart parking lot, he (Officer Perry) raised his “mike” to instruct the defendant on what to do next, and saw that the defendant was already out of his truck and approaching. Officer Perry, dropped his “mike” to the floor and opened his door to separate himself from the defendant. The defendant was pushed back by the door, and Officer Perry “really had a chance to look at [the defendant],” as he (Officer Perry) was about to ask the defendant to please step back to his vehicle. However, before Officer Perry could say anything, the defendant apologized, and shot him in the chest. Officer Perry fell to the ground, momentarily paralyzed. Officer Perry looked back at the defendant and saw him “fooling around with his hands.” The defendant again approached Officer Perry and shot him in his spinal cord, left leg, left foot, and right leg. Officer Perry tried to keep the defendant in view throughout the shooting because he wanted to avoid being shot in the face or the head, and he saw the defendant drive off in his truck after the shooting. Officer Perry’s vehicle’s spotlight remained on the defendant’s truck throughout the ordeal. As well as identifying the defendant at trial, Officer Perry also correctly selected the defendant’s photograph out of an array of six photographs of white males with similar characteristics on the morning of August 15,1995.
The State presented testimony from Trooper Edmonson, who was within four feet of the shooter as the shooter was leaving, and as he was arriving at the crime scene. Trooper Edmonson testified that it seemed like things went into slow motion as he passed the shooter and fixated on a side-view of him. Subsequently, Trooper Edmonson “got chills” upon seeing a side-view of the defendant on television on the day of his arrest.
The State presented testimony from Jessie Blanchard, Toby Tyler Lusk’s girlfriend. Blanchard testified that Toby returned home, drunk, with the defendant at around 12:30 a.m. on August 18, 1995. The defendant left, saying he was going home. However, the defendant came back at around 1:30 a.m., looking flushed and carrying his gun under his arm. Blanchard asked the ^defendant if he was in trouble, and the defendant responded, “Yeah. Wake up Toby.” Blanchard woke up Toby, and he spoke with the defendant, but Blanchard did not overhear the conversation. Subsequently, when Blanchard learned of Officer Perry’s shooting, she told Toby that if the defendant “did it I don’t want him to stay here, but if he didn’t do it he can stay .” The defendant did not stay.
The State presented testimony from Toby Tyler Lusk (Toby), the defendant’s life-long friend and drinking partner. Toby testified that when he and the defendant were out drinking on August 12, 1995, he (Toby) drove the defendant’s truck because the defendant “had two DWI’s already that he was still facing charges for.” After Toby had “a good buzz going,” he drove himself and the defendant to his (Toby’s) home, went to sleep, and the defendant left in his truck to go home. Subsequently, Blanchard woke up Toby, tell *897 ing him that the defendant was in trouble. The defendant looked scared and told Toby that he (the defendant) had “fucked up” and “shot a cop.” The defendant had his gun with him, and asked Toby to get his brother, Andy Lusk. The men went to see Andy, who lived next door.
The defendant also told Andy that he (the defendant) had “shot a cop.” The defendant asked Toby and Andy if they knew how to disassemble a gun, but the men refused to touch the gun. Subsequently, after Toby was laying back in bed, he heard the defendant “fidgeting” and “clicking” with the gun, and speculated that he was attempting to take it apart. After Toby woke up, the defendant told him that he (the defendant) needed to “get rid of his gun,” and asked Toby to “bring him.” Toby asked the defendant “Where did you shoot him?” The defendant responded by pointing to Toby’s chest, and stating, “I shot him here.”
The defendant wanted to throw the gun “off the bridge,” but Toby did not want to witness him dispose of the gun, so he took him across the Old Mississippi River Bridge to the Port Allen side and told him, “Go do what you got to do and then come on and let’s go.” However, when the men arrived at the place where the defendant intended to dispose of the gun, another vehicle pulled up behind them. Toby drove himself and the defendant away, and then returned, but the other vehicle had not left. The men headed back for Baton Rouge, planning to throw away the gun while crossing the bridge. It took a couple of passes over the bridge until no one was behind them. The defendant then asked Toby whether he should throw the gun and clip separately, and Toby | ¿responded, “[JJust throw it.”- The defendant threw the gun out of the driver’s side window.[2] Toby concluded his testimony, testifying that, after the last time the defendant served time for driving while intoxicated, he stated that he would “shoot a cop,” rather than go back to jail.
The State presented testimony from Michael Andrew “Andy” Lusk, Sr. Andy corroborated Toby’s testimony concerning Toby and the defendant coming to him on August 13, 1995, and the defendant stating that he (the defendant) had “shot a police officer.” He also corroborated Toby’s testimony concerning the defendant asking for help to “take apart” his gun, a black .45. In regard to defendant’s alleged statements after the last time he had served time for driving while intoxicated, Andy testified that the defendant had told him that he (the defendant) would rather die than go back to jail. Andy did not deny that the defendant had stated that he would “kill a cop” the next time that he was stopped, rather, he testified that the defendant had not made that statement to him.
The State presented testimony from Katherine R. Ellis, Toby and Andy Lusk’s mother. Ellis testified that, while she was in the kitchen of her home, she overheard Toby and the defendant talking in the spring of 1995. The defendant stated that if he were pulled over, “he would shoot a policeman.” Ellis purportedly “blew up” and told the defendant that she did not ever want to hear him say anything so stupid again. She testified that the defendant responded, “Yes, Ma'am. I really— realize that was a stupid thing to say.... I would not do it. I wouldn’t want to look over my shoulder for the rest of my life.”
After scrutinizing the overwhelming evidence in this particular case, we conclude that the confluence of incriminating testimony presented at trial obviates any substantial prejudice to the defendant to the extent that he might have been deprived of any reasonable expectation of a fair trial. There was no abuse of discretion by the trial court in denying the instant motion for a mistrial. Accordingly, the assign- *898 merits of error asserting the necessity of a mistrial due to a Brady violation are lacking in merit. The conviction and sentence in the instant matter are upheld on rehearing.
CONVICTION AND SENTENCE AFFIRMED.

. In contrast, immediately after the witness, Su'jitra Moore, disclosed that she had seen the defendant’s photograph in the district attorney’s office, prior to her identification of the defendant, defense counsel requested more time to prepare for its responsive action the next morning, and the court adjourned the trial until 10:00 a.m. the next day.

. Although at trial, Toby testified that the defendant "threw the gun out my window of the car[,]” at a pre-trial motions hearing he had testified that the defendant threw the gun out of the passenger’s side window.