721 So.2d 1 (1998)
STATE of Louisiana
v.
Ricky FUGLER.
No. 97 KA 1936.
Court of Appeal of Louisiana, First Circuit.
September 25, 1998.
Rehearing Denied November 20, 1998.
*5 Jim Murray, Assistant District Attorney, Baton Rouge, for State of Louisiana.
*6 James Boren, Baton Rouge, for Defendant-Appellant Ricky Fugler.
Before FITZSIMMONS and GUIDRY, JJ., and CHIASSON,[1] J. Pro Tem.
REMY CHIASSON, Judge Pro Tem.
The defendant, Ricky Fugler, was charged by grand jury indictment with one count of attempted first degree murder, a violation of La. R.S. 14:27 and La. R.S. 14:30. He pled not guilty. After a jury trial, he was found guilty as charged and was sentenced to fifty years at hard labor. The defendant now appeals, designating eleven assignments of error.

FACTS
The record reflects that, at approximately 1:00 a.m. on August 13, 1995, the victim, Baton Rouge City Police Officer Jason Merrell Perry, was returning from an extra-duty assignment when he noticed a dark blue, extended cab, Chevrolet or GMC pick-up truck with tinted windows driving erratically in front of him. Officer Perry activated his vehicle's bar lights and siren, and the truck exited the interstate at Acadian Thruway. Officer Perry pursued the truck into a nearby Wal-Mart parking lot. Once the vehicles came to a stop, Officer Perry raised his "mike" to instruct the defendant on what to do next, but the defendant was already out of his truck and approaching. Officer Perry, dropped his "mike" to the floor and opened his door to separate himself from the defendant. The defendant apologized and shot Officer Perry in the chest. Officer Perry fell to the ground, momentarily paralyzed. The defendant again approached Officer Perry and shot him in his spinal cord, left leg, left foot, and right leg. Officer Perry also suffered injuries from concrete thrown up by the bullets. Officer Perry identified the defendant at trial and also correctly selected the defendant's photograph out of an array of six photographs of white males with similar characteristics on the morning of August 15, 1995. The defendant was arrested after police interviewed witnesses, broadcast a description of the suspect and suspect vehicle to the media, and friends of the defendant came forward with information concerning his confession to the crime and his disposal of the evidence. The defendant was tried and convicted on these bases, as well as other evidence. The instant appeal ensued.

DISCUSSION

JUDY KAY BETHLEY
In assignment of error number 1, the defendant contends the trial court erred in denying his challenge against juror Judy Kay Bethley because she was not impartial because she "either lied or did not answer completely when asked if she had any relatives in law enforcement or relatives who worked for a prosecutor's office." He relies upon State v. Martin, 558 So.2d 654, 661-62 (La.App. 1st Cir.), writ denied, 564 So.2d 318 (La.1990) and attempts to distinguish State v. Forbes, 348 So.2d 983, 984-85 (La.1977).
A mistrial may be ordered, and in a jury case, the jury dismissed, when false statements of a juror on voir dire prevent a fair trial. La.Code Crim. P. art. 775(A)(6).
In Martin, this Court found no abuse of discretion in a trial court's declaration of a mistrial when a juror failed to provide information which was specifically requested (her panel had been specifically questioned concerning whether or not a close friend or relative had been a crime victim), and thereby concealed a possible ground for disqualification or challenge (the defendant had been on trial for, inter alia, aggravated rape, and the juror's younger sister had been a victim of rape).
In Forbes, the Louisiana Supreme Court found no abuse of discretion in a trial court's refusal to declare a mistrial when a juror had twice answered negatively when his panel had been asked whether any of them were related to a law enforcement agent, but it was subsequently learned that the juror had one son who was a city policeman and another who was a deputy sheriff. The juror had *7 explained to the trial court that he understood the question to refer to the arresting officers in the case. The supreme court noted that the juror had testified that he misunderstood the question, that the mistake was unintentional, and that the juror had responded truthfully to the question propounded. Forbes, 348 So.2d at 985.
In the instant case, the first panel of potential jurors, which included Judy Kay Bethley, was questioned by the trial court as follows:
Is there anybody here who has friends or relatives employed by the district attorney's office, the department of corrections, the state or city police, the sheriff's office or any other law enforcement agency?
Bethley did not respond affirmatively to this question. Another juror in the first panel, Charles Ginart, informed the court that he had a friend who was "with the FBI." The court questioned Ginart concerning whether he would be able to evaluate the credibility of any law enforcement persons testifying in the same manner as the other persons testifying and Ginart answered affirmatively. In questioning the jurors of the first panel, the State questioned Bethley if she had ever observed any police officers doing something that she thought exceeded their authority. Bethley answered that the only times she had interacted with police officers were when she had twice received traffic tickets. The State asked Bethley if she had felt that the officers had not used clear judgment in citing her and Bethley answered negatively, admitting that she had been speeding. Lastly, the State asked Bethley what her attitude towards police officers in general was, and she responded that police officers had to be judged individually. Prior to the defense beginning its questioning of the first panel, Michelle Fisher informed the court that her brother had been a city policeman in 1979 and 1980. The court questioned Fisher concerning whether she would be able to weigh the credibility of Baton Rouge City Police Officers testifying in the same manner as other persons testifying and Fisher answered affirmatively. The defense began its questioning by asking Ginart for the name of his friend in the FBI. The defense explained why it questioned Ginart, as follows:
It's because if you guys are friends with police officers and youand you think that they, you knowa lot of people that are friends with police officers hold them in a higher regard than they do, you know, other people. And if thatand there is nothing wrong with that. I am not saying there is anything wrong with that. I'm just saying if you, you knowif you were in my spot you would want to know that. You know, if your best friend is a policeman or your husband is in law enforcement of you're married to the D.A. or something like that, you know, I want to know about it. Do you know what I mean? Okay.
Bethley was selected as a juror. Subsequently, on the fifth day of trial, the defense stated that it had gone over its notes from the voir dire examination of panel number one, and noted Michelle Fisher had been challenged peremptorily by the State after she stated that she had had a brother who had been a police officer several years ago. According to the defense, therefore, there was an open-ended discussion on that panel regarding "answers to the law enforcement officers [questions]." The defense moved "to strike" Bethley "for one of two reasons. Either sheand [defense] have absolutely no basis for this but either she heard the question and chose not to answer it or the question was not specifically put to her." The defense alleged that Bethley had a brother, Tommy Gibson, who was a city police officer for ten to twelve years, and who then became a city prosecutor. The defense stated that it had no reason to suggest that Bethley had misled the court intentionally.
The court denied the defense's challenge against Bethley, noting that it had questioned Bethley's panel concerning individuals "employed," "meaning not past employment, but currently employed[.]"
There was no abuse of discretion in denying the defendant's challenge against Bethley. Bethley did not make false statements on voir dire, and there is no evidence that Bethley's service prevented the defendant from obtaining a fair trial. See La.Code Crim. P. art. 775(A)(6). This was not a case *8 of a juror hiding information that would disqualify her from service if known. See Martin, 558 So.2d at 661-62. Rather, this was a case of a juror truthfully answering the question propounded. See Forbes, 348 So.2d at 985. The defense has no right to a mistrial on the basis of a juror's failure to answer a question that was never asked. The defendant attempts to distinguish Forbes, arguing that the fact that the instant crime was perpetrated against a police officer "calls for a heightened sensitivity to connections with law enforcement officials." However, a "heightened sensitivity" alone does not equal error. If the defense wanted Bethley disqualified from service on the jury, it was incumbent upon the defense to establish a legal basis to prevent her service.
The defendant next attempts to distinguish Forbes, arguing that in Forbes a mistrial was sought, whereas in the instant case only a challenge for cause was sought. However, the defendant's allegations concerning Bethley's omissions/commissions and the defendant's reliance upon Martin, sound in mistrial. We also note that the defendant's challenge against Bethley came five days into trial and not during voir dire. However, even assuming arguendo, that the defendant's challenge against Bethley was a challenge for cause, the challenge would still be without merit. A trial court is vested with great discretion in ruling on challenges for cause, and that ruling will not be disturbed unless a review of the voir dire as a whole indicates an abuse of that discretion. State v. Berry, 95-1610, p. 4 (La.App. 1st Cir.11/8/96); 684 So.2d 439, 447, writ denied, 97-0278 (La.10/10/97); 703 So.2d 603. There would be no abuse of discretion in denying a challenge for cause against Bethley because the defense never showed that she was not impartial. See La.Code Crim. P. art. 797(2).
Lastly, the defendant attempts to distinguish Forbes on the basis that therein the court conducted a hearing concerning the impartiality of the challenged juror. However, the hearing referenced in Forbes was conducted in response to that defendant's motion for a mistrial. Since the defense in the instant matter did not move for a mistrial on the basis of Bethley's alleged impartiality, or upon any basis, the trial court may not be faulted for failing to conduct a hearing in response to a motion for a mistrial.
This assignment of error is without merit.

CASE AGENT
In assignment of error number 2, the defendant contends the trial court erred in permitting the victim to be designated as case agent and to sit at the State's table during trial.
In a pre-trial hearing, the defendant objected to the State's designation of Officer Perry as case agent. The State responded that Officer Perry was a police officer and that he had been intimately involved in the investigation and "workup" of the case. The State further argued that, Officer Perry's input, suggestions, and advise were almost essential to the State in its conduct of the case and that the volume of evidence required the State to turn to the help that Officer Perry was capable of giving and willing to give. The trial court overruled the objection.
The purpose of sequestration is to assure that a witness will testify as to his own knowledge of the events, to prevent the testimony of one witness from influencing the testimony of others, and to strengthen the role of cross-examination in developing facts. The resolution of sequestration problems is within the sound discretion of the trial court. On appeal, the reviewing court will look at the facts of each case to determine whether or not a sequestration violation resulted in prejudice to the accused. State v. Nevers, 621 So.2d 1108, 1112 (La.App. 1st Cir.), writ denied, 617 So.2d 906 (La.1993).
The exclusion of witnesses is governed by Louisiana Code of Evidence article 615. La. Code Crim. P. art. 764.
La.Code Evid. art. 615, in pertinent part, provides:
A. As a matter of right; exceptions. On its own motion the court may, and on request of a party the court shall, order that the witnesses be excluded from the courtroom or from a place where they can see or hear the proceedings, and refrain *9 from discussing the facts of the case with anyone other than counsel in the case. In the interests of justice, the court may exempt any witness from its order of exclusion. However, this Article does not authorize exclusion of:
. . . . .
(2) A single officer or single employee of a party which is not a natural person designated as its representative or case agent by its attorney;
(4) The victim of the offense, upon motion of the prosecution; however, if a victim is to be exempted from the exclusion order, the court shall require that the victim give his testimony before the exemption is effective and the court shall at that time prohibit the prosecution from recalling the victim as a witness in the state's prosecution in chief and in rebuttal. The court shall also enter such other order as may appear reasonably necessary to preserve decorum and insure a fair trial, provided that the victim shall not be allowed to sit at the counsel table.
Official comment (d) to the above article recognizes that mechanical application of the case agent exemption may result in manifest unfairness to the defendant. Accordingly, the comment suggests that when a law enforcement officer who is designated as the State's representative is also expected to testify as a fact witness, the law enforcement agent should testify prior to all other fact witnesses. This court has found reversible error where the principal witness against a defendant, designated the State's representative, was permitted to listen to the testimony of other State witnesses before he testified at trial. See State v. Lopez, 562 So.2d 1064, 1066-67 (La.App. 1st Cir.1990). However, in the instant case the State's representative, Officer Perry, was the State's first witness to testify at trial. Accordingly, any possibility of prejudice to the defendant due to Officer Perry's case agent designation while also being a fact witness was indeed minimized.
In regard to Officer Perry's sitting at the State's table during trial, although we recognize that, as the victim, such seating of Officer Perry was prohibited by La.Code Evid. art. 615(A)(4), we also find that Officer Perry's seating did not affect substantial rights of the defendant, and thus, was harmless beyond a reasonable doubt. See La. Code Crim. P. art. 921. The defendant argues that Officer Perry served as "a state prop to constantly remind the jury of [his] injuries and thereby appeal to the jurors' emotion of sympathy." However, even had Officer Perry not sat at the State's table, the jury still could have viewed his injuries because, upon motion of the State, Officer Perry would have been excluded from the witness sequestration rule. See La.Code Evid. art. 615(A)(4). Further, we note that the defendant's accusation that the State used Officer Perry as a prop is nothing more than speculation. The State presented sound reasons for Officer Perry's being seated at the defense table, which the trial court found persuasive.
This assignment of error is without merit.

SU'JITRA KAY MOORE
Assignments of error numbers 3, 4, 5, 6, and 7 all concern Su'jitra Kay Moore (Moore). The defendant contends the trial court: erred in not excluding the testimony of Moore (assignment of error number 3), erred in not suppressing the in-court identification by Moore (assignment of error number 4), erred in not suppressing the photo shown to Moore five days before trial (assignment of error number 5), erred in not sanctioning the government for failing to advise the court of Moore's conflicting statements and her identification of Fugler's photograph five days before trial (assignment of error number 6), and erred in denying the defense motion for a mistrial based upon Moore's testimony and discovery violations by the State (assignment of error number 7).
Moore had worked at an Exxon gas station separated from the crime scene by South Acadian Thruway. At approximately 1:00 a.m. on the morning of the crime, Moore was inside of the gas station by its wall facing the crime scene, talking to a friend on a telephone located next to a window. Moore saw a State Trooper make a vehicle stop to her left (the Caterie parking lot). Subsequently, Moore saw another police officer made a *10 vehicle stop at the crime scene (the Wal-Mart parking lot). Shortly thereafter, Moore heard two gunshots followed by more gunshots and looked out of the window at the crime scene. Moore actually saw the shooter turning back around to fire the second round of shots after initially walking away from Officer Perry. Moore ran outside as the shooter was driving away from the wounded officer at the crime scene. She was close enough to the wounded officer to hear him saying, "Officer down, officer is down." Moore made eye-contact with the shooter, who was driving a truck, as he got into the left turn lane to turn onto Perkins Road from South Acadian Thruway. The shooter paused at the traffic light "for a minute," waiting for the turn signal. On cross-examination, Moore agreed that she saw the shooter for a matter of seconds, but added that those seconds "seemed like hours" and "seemed like forever" to her. The truck was "a blue custom truck like a new expensive truck." The truck had tinted windows, but the driver's window was partially down, which allowed Moore to see that the shooter was wearing a white shirt. The truck turned left onto Perkins Road, and Moore ran into the gas station and called 911 to report the shooting. The State introduced a tape recording of Moore's 911 call into evidence, and the defense introduced a transcript of the call. In the call, Moore described the shooter as a white male with dark brown hair. She described the truck as a 1994 or 1995 midnight blue Chevy side-step truck with tinted windows. At trial, Moore added that she remembered the shooter having a moustache and stated that she had given a description of the shooter to the police officer in charge at the crime scene. She described the shooter as having a moustache, as having dark brown or black hair, and as wearing a white shirt.
During her testimony at trial, Moore pointed out the defendant as the person she had seen driving the truck after the shooting. She commented that the defendant's hair was longer on the morning of the crime. When questioned concerning how sure her identification of the defendant as the shooter was, Moore responded, "I am positive. He just had longer hair at the time. When I saw him he had longer hair. It was wavier in the back, curly in the back. That's all. It was longer. And this was a little longer like in the top."
Subsequently, in response to defense questioning, Moore stated that she had seen the defendant's "picture" in the newspaper on or around the day of his arrest (August 15, 1995) and told her fiance, her aunt, and her mother, "That's him." The defense asked Moore whether she had ever discussed seeing the photograph with Furlow (an investigator employed by the district attorney's office) or anyone else from the district attorney's office and she responded affirmatively. In response to further questioning, Moore revealed that she had seen the photograph five or six days earlier in a conference room in the district attorney's office. The defense asked Moore whether she had been shown the picture while being questioned concerning whether it was of the same person she had seen in the truck after the shooting. Moore answered negatively, stating, "No, nobody didn't show me that picture. I saw the picture and said that's him." Moore indicated that the picture had been on the table along with many other items. Subsequently, Moore also revealed that on another occasion, she had spoken to the district attorney concerning what she had witnessed and that he had informed her that he was "taping" everything she said.
The defense requested a recess, which the court granted. Defense counsel argued that Moore's testimony revealed that the State had concealed the fact that Moore had been brought to a room and presented with a picture of the defendant, and thus, had been subjected to a suggestive identification procedure. Defense counsel stated that he was taken by complete surprise by Moore's revelations and would like time to prepare for what to do with her on the next morning. The court adjourned the trial until 10:00 a.m. the next day.
The next day, the defense moved to suppress Moore's in-court identification of the defendant on the grounds that it was tainted by the reinforcement which occurred five or *11 six days prior to trial in the district attorney's office. The defense also formally moved for a mistrial on the basis of discovery violation. Additionally, the defense moved to have the court examine Moore's tape recorded statement in camera to determine whether any inconsistencies existed between that statement and her testimony at trial. The State claimed that Moore's statement had not been recorded and no transcript of the same existed. Defense counsel responded, that if that were the case, he would like to impeach Moore's testimony that her meeting with the district attorney was "being taped." Three days before the end of trial, the State informed the court that it had located a taped statement from Moore and presented a copy of the tape for the court's in camera inspection. Subsequently, the defense supplemented its grounds for a mistrial, stating that the failure to disclose the existence of Moore's taped statement compromised its ability to confront and cross-examine the witnesses. Ultimately, after listening to the taped statement, the court denied the motion for a mistrial, and the defense objected to the court's ruling. Shortly before the presentation of closing arguments on the last day of trial, the district attorney brought to the court's attention the circumstances surrounding the discovery of Moore's recorded statement. The district attorney explained that he had made the recording, had forgotten that he had made it, and had not been asked about it. He also stated that he did not believe that the statement contained any exculpatory evidence and confirmed Moore's testimony at trial.
In questioning Moore, the defense repeatedly emphasized that in her 911 call Moore stated, "All I know is he white, he got dark brown hair and that's all I seen." The defense also emphasized the fact that Moore described the truck as a Chevy truck, rather than the GMC truck that the defendant drove. Moore explained that the truck looked like a "new Chevy show truck," and that she was neither a car salesman nor a man, and that she was not familiar with the names of trucks. Additionally, Moore's description of the shooter's hair, in respect to whether it was straight or curly on the back of his head, differed from the time she spoke to the district attorney (October 19, 1995) and the time she testified at trial (March 18, 1996).

The photograph viewed in the district attorney's office
In a motion for discovery, the defendant had requested:
B. Specifically, will you allow Ricky Fugler to inspect and/or scientifically test each and every photographic line up used in his identification.
In response to the defense's accusation of a discovery violation, the State argued that there had been no deliberate attempt to mislead. The State argued that no photographic array had been shown to Moore, and thus, the discovery request had been inapplicable. The State pointed out that Moore had testified that she identified the defendant's photograph spontaneously upon seeing it lying on the table. The State also pointed out that Moore had seen the defendant's photograph in the newspaper shortly after the crime and had identified him at that time to her family.
Moore's revelations concerning her observance of the defendant's photograph in the district attorney's office came during her cross-examination by the defense, and therefore, while she was obviously available to the defense for cross-examination.
However, even assuming arguendo, that Moore's viewing of the defendant's photograph in the district attorney's office was suggestive, the defendant still would not have established a basis for suppression of the identification. A defendant who seeks to suppress an identification must prove two things. First, he must prove that the identification itself was suggestive. Second, he must show that there was a likelihood of misidentification as a result of the identification procedure. State v. Lowenfield, 495 So.2d 1245, 1253 (La.1985), cert. denied, 476 U.S. 1153, 106 S.Ct. 2259, 90 L.Ed.2d 704 (1986). The second factor is clearly lacking in the instant record.
The factors to be considered in assessing reliability are as follows: (1) the opportunity of the witness to view the criminal at the time of the crime, (2) the witness' *12 degree of attention, (3) the accuracy of the witness' prior description of the criminal, (4) the witness' level of certainty, and (5) the time between the crime and the confrontation. State v. Harris, 510 So.2d 439, 442 (La.App. 1st Cir.), writ denied, 516 So.2d 129 (La.1987), citing, Manson v. Brathwaite, 432 U.S. 98, 97 S.Ct. 2243, 53 L.Ed.2d 140 (1977).
A thorough review of the record with regard to the Manson factors supports a finding that Moore's out-of-court identification of the defendant was reliable and that her in-court identification had an independent basis. The following factors are considered:
1. Opportunity to view at the time of the crime: Moore viewed the front of the defendant's face from outside of the gas station where she worked, while the defendant was stopped and waiting for a turn signal. Moore was merely two traffic lanes from the defendant when she viewed him. (The median on South Acadian Thruway ends as the turn lane begins (State Exhibit, Photo # 1)). The trooper who also stopped a vehicle at approximately the same time as Officer Perry, testified that the crime scene was illuminated by the cars in the vicinity, the light from the Caterie, and "possibly from the service station." However, the lighting was sufficient enough for Moore to be able to provide accurate details in regard to the defendant's race, facial hair, hair color,[2] hair length, clothing color, as well as the color, age, and tinted windows of the defendant's truck.
2. Degree of attention: The fact that Moore was able to provide so many accurate details reflects that her degree of attention was very high. She also had a strong selfinterest in closely observing the defendant's next move after shooting Officer Perry because her close proximity to the shooting, the fact that she was alone, and the fact that she had made eye-contact with the defendant made her a target. Moore testified that she "caught [the shooter's] eyes," and that frightened her. After witnessing the shooting, Moore asked to be transferred to another store.
3. Accuracy of prior description: The fact that Moore gave a very scant description of the defendant in her 911 telephone call is understandable in light of the fact that a review of the telephone call reveals that Moore's principal concern, to her credit, was getting help to the wounded officer as quickly as possible. At trial, Moore thought that she had described the defendant's hair as dark brown or black in her 911 call and described it in court as "black. Dark brown." She also gave this description at the crime scene. Nor do we find Moore's description of the defendant's vehicle as a Chevy rather than GMC truck to be indicative of unreliability. A trained mechanic and personal friend of the defendant's testified, "I don't think that you could make aa difference between a GMC and a Chevrolet from its side view at a distance." In regard to the inconsistency between Moore's descriptions of whether the back of the defendant's hair was either straight or curly, we note that such detail would be difficult to view and report accurately under the best of conditions. Inconsistency in regard to such a minute detail hardly indicates unreliability in identification, particularly when considered in light of all of the other details Moore correctly provided.
4. Degree of certainty: Moore was "positive" and unequivocal in identifying the defendant as the shooter.
5. Time between crime and confrontation: The crime was committed at approximately 1:00 a.m. on August 13, 1995. Moore viewed the defendant's photograph in the district attorney's office on approximately March 14, 1996. However, Moore identified "the same exact picture" as the shooter from a newspaper on or around the day of the defendant's arrest (August 15, 1995) to her fiance, her aunt, and her mother.

Moore's taped statement.
La.Code Crim. P. art. 729.5 prescribes sanctions for failure to honor a discovery right. As pertinent here, La.Code Crim. P. art. 775 provides that a mistrial shall be ordered when prejudicial conduct in *13 or outside the courtroom makes it impossible for the defendant to obtain a fair trial. However, a mistrial is a drastic remedy which should be granted only when the defendant suffers such substantial prejudice that he has been deprived of any reasonable expectation of a fair trial. Determination of whether a mistrial should be granted is within the sound discretion of the trial court, and the denial of a motion for a mistrial will not be disturbed on appeal without abuse of that discretion. Berry, 95-1610 at p. 7; 684 So.2d at 449.
In the instant case, immediately after Moore disclosed that she had seen the defendant's photograph in the district attorney's office, defense counsel requested more time to prepare for its responsive action the next morning, and the court adjourned the trial until 10:00 a.m. the next day. However, no similar request was made after the State disclosed that it had discovered Moore's taped statement. In fact, when the State presented the statement to the court on March 25, 1996, and waived any objection to the court reviewing it for contradictions between it and Moore's testimony at trial, the defense responded, "That's fine with me, Judge, ...." The next day the defense supplemented its grounds for a mistrial, stating that the failure to disclose the existence of Moore's taped statement compromised its ability to confront and cross-examine the witnesses. The defense acknowledged that the court had permitted it to review a portion of the statement, particularly the portion alleged to be Brady material, concerning the defendant's hair. The State argued that if the reference to the defendant's hair on the taped statement was Brady material, it only became so after Moore's testimony at trial. The defense also acknowledged that it had the opportunity to, and the court had suggested that it, re-call Moore to the stand and question her about her taped statement, but did not wish to do so "for tactical and strategic reasons." Ultimately, the court denied the motion for a mistrial, and the defense objected to the court's ruling.
There was no abuse of discretion by the trial court in denying the instant motion for a mistrial. The alleged Brady material was disclosed to the defense prior to the end of trial; and any prejudice caused by the State's late disclosure of Moore's taped statement could have easily been eliminated by the defense simply recalling Moore to the stand, something the defense chose not to do for its own reasons. In any event, the State's late disclosure of Moore's statement certainly did not make it impossible for the defendant to obtain a fair trial. The defendant did not suffer such substantial prejudice that he was deprived of any reasonable expectation of a fair trial.
The prosecutor may not suppress evidence which is favorable to the accused and material to either guilt or punishment. Brady v. Maryland, 373 U.S. 83, 87, 83 S.Ct. 1194, 1197-1198, 10 L.Ed.2d 215 (1963). Favorable evidence includes both exculpatory evidence and evidence impeaching the testimony of a witness when the reliability or credibility of that witness may be determinative of defendant's guilt or innocence, or when it may have a direct bearing on the sentencing determination of the jury. United States v. Bagley, 473 U.S. 667, 676, 105 S.Ct. 3375, 3380, 87 L.Ed.2d 481 (1985); Giglio v. United States, 405 U.S. 150, 154, 92 S.Ct. 763, 766, 31 L.Ed.2d 104 (1972). When Brady matter is withheld, a defendant is entitled to a new trial only if the evidence is "material." Evidence is material "if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different. A `reasonable probability' is a probability sufficient to undermine confidence in the outcome." Bagley, supra, at 678, 105 S.Ct. at 3381. State v. Seals, 95-0305, pp. 14-15 (La.11/25/96); 684 So.2d 368, 378-79.
Even if Moore's reference (to the back of the defendant's hair being straight) in her taped statement could be considered Brady material, a thorough review of the record reveals that this evidence was not "material" such that the defendant would be entitled to any relief. There is no reasonable probability sufficient to undermine confidence in the outcome that, had the evidence *14 been disclosed to the defense, the result of the proceeding would have been different.
The State presented Officer Perry's identification of the defendant as the shooter. Officer Perry testified that after he pursued the defendant and his truck into the Wal-Mart parking lot, he (Officer Perry) raised his "mike" to instruct the defendant on what to do next, and saw that the defendant was already out of his truck and approaching. Officer Perry, dropped his "mike" to the floor and opened his door to separate himself from the defendant. The defendant was pushed back by the door, and Officer Perry "really had a chance to look at [the defendant]," as he (Officer Perry) was about to ask the defendant to please step back to his vehicle. However, before Officer Perry could say anything, the defendant apologized, and shot him in the chest. Officer Perry fell to the ground, momentarily paralyzed. Officer Perry looked back at the defendant and saw him "fooling around with his hands." The defendant again approached Officer Perry and shot him in his spinal cord, left leg, left foot, and right leg. Officer Perry tried to keep the defendant in view throughout the shooting because he wanted to avoid being shot in the face or the head, and he saw the defendant drive off in his truck after the shooting. Officer Perry's vehicle's spotlight remained on the defendant's truck throughout the ordeal. As well as identifying the defendant at trial, Officer Perry also correctly selected the defendant's photograph out of an array of six photographs of white males with similar characteristics on the morning of August 15, 1995.
The State presented testimony from Trooper Edmonson, who was within four feet of the shooter as the shooter was leaving, and as he was arriving at the crime scene. Trooper Edmonson testified that it seemed like things went into slow motion as he passed the shooter and fixated on a side-view of him. Subsequently, Trooper Edmonson "got chills" upon seeing a side-view of the defendant on television on the day of his arrest.
The State presented testimony from Jessie Blanchard, Toby Tyler Lusk's girlfriend. Blanchard testified that Toby returned home, drunk, with the defendant at around 12:30 a.m. on August 13, 1995. The defendant left, saying he was going home. However, the defendant came back at around 1:30 a.m., looking flushed and carrying his gun under his arm. Blanchard asked the defendant if he was in trouble, and the defendant responded, "Yeah. Wake up Toby." Blanchard woke up Toby, and he spoke with the defendant, but Blanchard did not overhear the conversation. Subsequently, when Blanchard learned of Officer Perry's shooting, she told Toby that if the defendant "did it I don't want him to stay here, but if he didn't do it he can stay." The defendant did not stay.
The State presented testimony from Toby Tyler Lusk (Toby), the defendant's life-long friend and drinking partner. Toby testified that when he and the defendant were out drinking on August 12, 1995, he (Toby) drove the defendant's truck because the defendant "had two DWI's already that he was still facing charges for." After Toby had "a good buzz going," he drove himself and the defendant to his (Toby's) home, went to sleep, and the defendant left in his truck to go home. Subsequently, Blanchard woke up Toby, telling him that the defendant was in trouble. The defendant looked scared and told Toby that he (the defendant) had "fucked up" and "shot a cop." The defendant had his gun with him, and asked Toby to get his brother, Andy Lusk. The men went to see Andy, who lived next door. The defendant also told Andy that he (the defendant) had "shot a cop." The defendant asked Toby and Andy if they knew how to disassemble a gun, but the men refused to touch the gun. Subsequently, after Toby was laying back in bed, he heard the defendant "fidgeting" and "clicking" with the gun, and speculated that he was attempting to take it apart. After Toby woke up, the defendant told him that he (the defendant) needed to "get rid of his gun," and asked Toby to "bring him." Toby asked the defendant "Where did you shoot him?" The defendant responded by pointing to Toby's chest, and stating, "I shot him here." The defendant wanted to throw the gun "off the bridge," but Toby did not want to witness him dispose of the gun, so he took him across the Old Mississippi River Bridge *15 to the Port Allen side and told him, "Go do what you got to do and then come on and let's go." However, when the men arrived at the place where the defendant intended to dispose of the gun, another vehicle pulled up behind them. Toby drove himself and the defendant away, and then returned, but the other vehicle had not left. The men headed back for Baton Rouge, planning to throw away the gun while crossing the bridge. It took a couple of passes over the bridge until no one was behind them. The defendant then asked Toby whether he should throw the gun and clip separately, and Toby responded, "[J]ust throw it." The defendant threw the gun out of the driver's side window.[3] Toby concluded his testimony, testifying that, after the last time the defendant served time for driving while intoxicated, he stated that he would "shoot a cop," rather than go back to jail.
The State presented testimony from Michael Andrew "Andy" Lusk, Sr. Andy corroborated Toby's testimony concerning Toby and the defendant coming to him on August 13, 1995, and the defendant stating that he (the defendant) had "shot a police officer." He also corroborated Toby's testimony concerning the defendant asking for help to "take apart" his gun, a black .45. In regard to defendant's alleged statements after the last time he had served time for driving while intoxicated, Andy testified that the defendant had told him that he (the defendant) would rather die than go back to jail. Andy did not deny that the defendant had stated that he would "kill a cop" the next time that he was stopped, rather, he testified that the defendant had not made that statement to him.
The State presented testimony from Katherine R. Ellis, Toby and Andy Lusk's mother. Ellis testified that, while she was in the kitchen of her home, she overheard Toby and the defendant talking in the spring of 1995. The defendant stated that if he were pulled over, "he would shoot a policeman." Ellis purportedly "blew up" and told the defendant that she did not ever want to hear him say anything so stupid again. She testified that the defendant responded, "Yes, Ma'am. I reallyrealize that was a stupid thing to say.... I would not do it. I wouldn't want to look over my shoulder for the rest of my life."
These assignments of error are without merit.

SANITY COMMISSION
In assignment of error number 8, the defendant contends the trial court erred in denying his motion for a sanity commission and for a continuance. He relies heavily upon La.Code Crim. P. art. 641, particularly, official comment (b) thereto, which references certain statements from State v. Swails, 223 La. 751, 66 So.2d 796 (1953).
On March 5, 1996, the defendant filed a written motion for a continuance. Therein he requested that the trial date of March 11, 1996,[4] be reassigned if all of his psychological examinations, evaluations and results had not been completed prior to trial. The next day he filed a motion for mental examination and appointment of a sanity commission. Defendant set forth therein that Dr. Turin had provisionally diagnosed him as suffering from alcohol intoxication and alcohol dependence. The defendant further alleged that Dr. Turin believed that he experiences "black outs" and amnesia, and that he needed further examination by a neuropsychologist. The defendant urged that because reasonable grounds existed to believe that he (defendant) suffers from a mental disease or defect rendering him incapable of assisting in his own defense, the court was required to order a mental examination and appoint a sanity commission.
The appointment of a lunacy commission is not a perfunctory matter or a ministerial duty of the trial court, nor is it guaranteed to every accused in every case. The fact that the defendant's capacity to proceed is called into question does not, for *16 that reason alone, require the trial court to order a mental examination of the defendant; rather, he must have reasonable grounds to doubt the defendant's capacity. La.Code Crim. P. art. 643. The ordering of a sanity commission to inquire into the defendant's present capacity to proceed rests in the sound discretion of the trial court. State v. Folse, 623 So.2d 59, 66 (La.App. 1st Cir. 1993).
La.Code Crim. P. art. 641 provides:
Mental incapacity to proceed exists when, as a result of mental disease or defect, a defendant presently lacks the capacity to understand the proceedings against him or to assist in his defense.
Official comment (b) to the above article references Swails, 223 La. at 762-63, 66 So.2d at 800, as follows:
[The contention that to be able to assist in his defense, the defendant must have sufficient memory to enable him to testify and inform his counsel of material facts] would be very forceful and persuasive were this a prosecution in which the accused was pleading not guilty for, in such case, his inability to inform his counsel of any of the facts regarding his own movements in relation to the charges against him would materially affect him in his defense. But, here, appellant is pleading insanity at the time of the commission of the crimesa special defense under our law. LSA-R.S. 14:14 and 15:261.
However, as evidenced by the second sentence quoted above, the statement the defendant relies upon from Swails was merely obiter dicta.[5]
Additionally, the instant case is readily distinguishable from Swails. First, the special defense asserted in Swails was not involved here. Second, in Swails, it was established that the defendant suffered from cerebral arteriosclerosis and had previously been declared insane. 223 La. at 754-55, 66 So.2d at 797. However, the instant defendant failed to establish that he was unable to assist in his defense as a result of "mental disease or defect." To the contrary, one of the experts he presented to the court at the March 6, 1996, hearing on the instant motions, clinical psychologist Dr. Christine Turin, testified that the defendant had the capacity to understand the proceedings against him and the "only area where [the defendant] may not be totally competent is that he cannot remember what happened at the time of the offense." The defendant's other expert, clinical neuropsychologist John Francis Bolter, testified that he had examined the defendant to determine whether or not he suffered from any mental disorder that could be associated with organic brain disease or injury and concluded that he did not. Bolter also determined that the defendant's I.Q. was in the low average range and that cognitively the defendant was "fine." Additionally, Bolter found the defendant not to "show a loss of material over time, which is what [is seen] with the alcoholic type of amnesia..." and to have "a good long term memory." Both experts conceded however, that alcoholic blackouts were not their area of expertise.
The trial court, after reviewing the evidence and after listening to the testimony (which also included the testimony of the Lusk brothers), found as facts: (1) the defendant approached the Lusk brothers on the night of the crime with the intent to get or to seek their assistance in dismantling and disposing of evidence; and (2) the defendant had the mental capacity to proceed to and seek the assistance of the Lusk brothers, which "mitigates or goes against the idea of intoxication." The court also noted that the defendant had told Dr. Turin that he remembered getting up, taking a shower, and getting aspirin, but did not remember disposing of evidence after taking the shower. Thus, *17 the defendant claimed to have no memory of first, going to an isolated location to dispose of evidence with one of the Lusk brothers, and second, going back and forth across the Mississippi River Bridge until there were no witnesses, and then disposing of the weapon. Further, the defendant had told Dr. Turin that he left the Lusks because he felt that the wife of one of the Lusk brothers was unhappy with him. However, Toby Lusk testified that the defendant left because he asked him to. The court expressed its "grave doubts" concerning the defendant's claims of lack of memory given to the doctors and found that those claims were "self-serving." Accordingly, the court held that it had no reasonable basis to order a sanity commission and declined to do so.
Under these facts there was no abuse of discretion by the trial court in denying the defendant's motion for mental examination and appointment of a sanity commission. The record fully supports the trial court's decision and reasons. However, such may not always be the case. A court that proceeds without a sanity hearing does so at the risk of reversal.
Indeed, La.Code Crim. P. art. 641, official comment (b) apparently provides for the instant situation, stating, "Alcoholic amnesia, consisting of the defendant's failure to recollect his behavior while under the influence of excessive alcoholic beverages is never a bar to trial, since it is not `a result of mental disease or defect.'" (Citing State v. Palmer, 232 La. 468, 94 So.2d 439 (1957)).
The trial court also denied the defendant's motion for a continuance. The granting or denial of a motion for continuance rests within the sound discretion of the trial court and its ruling will not be disturbed on appeal absent a showing of a clear abuse of discretion. State v. Brown, 95-0755, pp. 3-4 (La.App. 1st Cir.6/28/96); 677 So.2d 1057, 1062.
The court expressed its belief, based upon the testimony it had heard, that the alleged need for a continuance was based upon the need to do further work in terms of preparing a defense. The court pointed out that intoxication had been a clear issue in the case since August, 1995, and that enough time had been set aside already. The court allowed the defendant until the beginning of jury selection, March 13, 1996, to apply for writs and/or a stay from this Court in regard to the continuance issue. However, the defendant failed to seek either relief.
After carefully reviewing the record, we are also convinced that there was no abuse of discretion by the trial court in denying the defendant's motion for continuance.
This assignment of error is without merit.

PHOTO LINE-UP SHOWN TO OFFICER PERRY
In assignment of error number 9, the defendant contends the trial court erred in denying his motion to suppress the photo line-up and the out-of-court and in-court identifications by Officer Perry.
The defendant has the burden of proof on a motion to suppress an out-of-court identification. See La.Code Crim. P. art. 703(D). In order to suppress an identification, the defendant must prove (1) that the identification was suggestive, and (2) that there was a likelihood of misidentification in the identification procedure. An identification procedure is unduly suggestive if, during the procedure, a witness's attention is focused on the defendant. A trial court's determination of the admissibility of an identification should be accorded great weight and will not be disturbed on appeal unless the evidence reveals an abuse of discretion. Johnson, 94-1561 at p. 7; 664 So.2d at 145.
The defendant filed a "motion to suppress photographic lineup and identification from photographic lineup as well as the identification of the pickup truck." Therein, he recognized, "As of this date, counsel for [the defendant] have not had the opportunity to examine the photographic lineup which was used for identification purposes in this case." The basis for the motion was, "[The defendant] asserts that the photo lineup itself must have been unduly suggestive and/or the manner in which it was handled and/or presented by law enforcement personnel must have been unduly suggestive, because [the *18 defendant] did not commit the crime and could not have been fairly identified."
The trial court tried the motion to suppress along with three additional motions to suppress and rendered its rulings on the motions in detailed written reasons. In regard to the instant motion to suppress, the court held:
The defendant in this case has not made any showing to this Court that the procedures used in the preparation of the photographic line-up were unduly suggestive or that the identification of the defendant by Officer Perry was unreliable. Accordingly, the defendant's motion to suppress the photographic lineup is denied.
There was no abuse of discretion in the trial court's denial of the instant motion to suppress. The court's ruling is fully supported by the record, which shows that the defendant failed to establish that Officer Perry's attention was focused on the defendant during his identification of the defendant from the photo line-up. See also State v. Robinson, 386 So.2d 1374, 1377 (La.1980) (trial court denial of motion to suppress photo line-up affirmed where defendant unable to prove that witness' attention was focused on defendant's photo). In particular, we reference the following exchange between the State and Officer Perry concerning the challenged photo line-up:
Q. Officer Perry, have you had any contacthave you ever seen the defendant before the night he shot you?
A. No, Sir.
Q. Before you were shown the photographic line-up were you told in any way which picture to pick?
A. No, Sir.
Q. In any way suggested which picture to pick?
A. No, Sir.
Q. Would you look at the photo line-up again, please?
A. Yes, Sir.
Q. Do there seem to be some resemblance between the 6 individuals in the photographic line-up? Is it a fair array?
A. Yes, Sir. I mean, it's quite fair. It's just the one picture that stands out is the one that I remember. I don't know any of these guys except for number 3, and that's only because of the night I got shot. I remember his face.
Q. Prior to that showing of the photo line-up, had you been shown any other picture or had any suggestion that would lead you or assist you in picking the defendant out of the photo line-up?
A. No, Sir.
Q. How much time did it take you to pick the defendant out of that photo line-up?
A. I looked at it maybe about 10 seconds but I mean immediately when I opened it up I knew who it was. I said it aloud the moment I opened it up and they told me to continue to look to be sure.
Q. Are you positive beyond any doubt in your mind that the person that shot you that night is [the defendant?]
A. I have no doubt whatsoever that's him. Yes, Sir.
In brief, the defendant argues that Officer Perry's photo identification of him was suggestive due to (1) Officer Perry's testimony that he viewed the composite "photograph" of the shooter prior to viewing the line-up, and (2) Officer Perry's "admission" that he had been told the suspect's name prior to viewing the photo line-up.
The evidence and the record, however, show that both of these contentions are completely unfounded. The alleged composite "photograph" is a computer generated image, rather than a photograph. The composite bears no more resemblance to the defendant than it does to any of the other five men pictured in the photo line-up. Thus, the composite could not have focused Officer Perry's attention on the defendant's photograph. In regard to Officer Perry learning the defendant's name prior to viewing the photo line-up, the record reveals that Officer Perry's first response to defense counsel's question of whether he (Officer Perry) learned the defendant's name before or after viewing the photo line-up was "afterwards." Subsequently, Officer Perry merely answered, "Possibly, yes," in response to defense counsel's questioning concerning *19 whether or not he (Officer Perry) was "positive" of when he learned the defendant's name. In any event, the photographs in the photo line-up were not identified by name, and the defendant never established that Officer Perry could have matched the defendant's name to his photograph. Thus, even assuming arguendo, that Officer Perry learned the defendant's name prior to viewing the photo line-up, such information could not have focused Officer Perry's attention on the defendant's photograph.
This assignment of error is without merit.
MOTION TO SUPPRESS EVIDENCE SEIZED DURING THE SEARCH OF THE DEFENDANT'S HOME PURSUANT TO A WARRANT
In assignment of error number 10, the defendant contends the trial court erred in denying his motion to suppress the evidence seized during the August, 1995 search of the residence at 5429 Summer Street.
A search warrant may issue only upon probable cause established to the satisfaction of a judge, by the affidavit of a credible person, reciting facts establishing the cause for issuance of the warrant. La. Const. art. I, Sec. 5; La.Code Crim. P. art. 162. Probable cause exists when the facts and circumstances within the affiant's knowledge, and of which he has reasonably trustworthy information, are sufficient to support a reasonable belief that an offense has been committed and that the evidence or contraband may be found at the place to be searched. The facts establishing probable cause for a search warrant must be contained within the four corners of the affidavit. La. Code Crim. P. art. 162. The judicial officer must be supplied with enough information to support an independent judgment that probable cause exists for the issuance of a warrant. State v. Kreitz, 560 So.2d 510, 512 (La.App. 1st Cir.), writ denied, 565 So.2d 940 (1990).
An affidavit supporting a search warrant is presumed to be valid. When a defendant proves that an affidavit contains false statements, it should be determined whether the misrepresentations are intentional or unintentional. Defendant must prove by a preponderance of the evidence that the affidavit contains intentional misrepresentations. Kreitz, 560 So.2d at 512.
Affidavits, by their nature, are brief, and some factual details must be omitted. Unless the omission is willful, and calculated to conceal information that would indicate that there is not probable cause, or would indicate that the source of other factual information in the affidavit is tainted, the omission will not change an otherwise good warrant into a bad one. In matters relating to the possibility that a warrant contains intentional misrepresentations, the question of the credibility of the witnesses is within the sound discretion of the trier of fact. His factual determinations are entitled to great weight and will not be disturbed unless clearly contrary to the evidence. The harsh result of quashing a search warrant, when the affidavit supports a finding of probable cause, should obtain only when the trial judge expressly finds an intentional misrepresentation to the issuing magistrate. Kreitz, 560 So.2d at 512-13.
The defendant filed his motion to suppress evidence seized during the August 1995, search of his home, asserting that the search warrant used in connection therewith was invalid due to lack of probable cause. Defendant also filed a memorandum in support of the motion. Therein, defendant alleged the following material omissions from the affidavit:
1. Witnesses at the scene of the crime reported that the person who shot Officer Perry was clean shaven. The affidavit presented to the judge in support of the search warrant omitted to say that [the defendant] in fact had a mustache and was not clean shaven.
2. Witnesses at the scene of the crime reported that the person who shot Officer Perry had dark shaggy hair. The affidavit presented to the judge omitted to say that Officer Perry reported that the person who shot him had short sandy colored hair.
3. Officer Perry reported that the person who shot him was wearing shorts and a shirt with cut off sleeves. The affidavit *20 presented to the judge omitted the fact that witnesses at the scene reported that the person who shot Officer Perry was wearing jeans with a white t-shirt over an open buttoned down shirt.
4. The affidavit presented to the judge omitted the fact that the same photo lineup presented to Officer Perry was presented to two other witnesses who were at the scene of the crime who identified someone other than [the defendant] as the person they saw shoot Officer Perry.
5. The affidavit omitted information of conflicting reports by witnesses concerning the description of the truck driven by the person who shot Officer Perry.
The trial court denied the instant motion to suppress after a thorough analysis of each alleged material omission as well as the warrant itself. The court also noted that, although the law does not normally permit a reviewing court to go outside of the four corners of a search warrant affidavit in reviewing a probable cause determination, where there are inadvertent material omissions, the reviewing court will look to outside evidence to support or destroy the probable cause finding. State v. Revere, 572 So.2d 117, 128 (La.App. 1st Cir.1990), writ denied, 581 So.2d 703 (La.1991).

The search warrant affidavit
The search warrant affidavit contained the following information: at approximately 1:00 a.m. on August 13, 1995, Officer Perry, in full uniform and driving a marked Baton Rouge Police Department vehicle, was eastbound on Interstate 10 when he noticed a dark blue full sized, step-side GMC or Chevrolet pick-up truck being driven in an erratic manner; Officer Perry signaled the driver to exit the interstate, and the driver did so pulling into the Wal-Mart parking lot on Perkins Road; after the truck stopped, the white male driver quickly exited the truck and approached Officer Perry before he could exit his vehicle; the driver apologized to Officer Perry, who requested that the driver produce a driver's license; the driver then produced a handgun and commenced firing at Officer Perry, striking him six times; Baton Rouge Police Department Crime Lab personnel recovered six spent .45 caliber cartridge cases and two .45 caliber projectiles from the crime scene; Louisiana State Police found that the markings on the projectiles were consistent with those which would have been produced by a Colt Model 1911 pistol or a copya model manufactured and widely distributed by Springfield Armory; Baton Rouge Police Department personnel broadcast a description of the suspect and his vehicle and distributed a wanted poster to the media, containing a composite of the suspect [the wanted poster was attached to the affidavit]; at approximately 8:00 a.m. on August 14, 1995, Detective Charles Armstrong received a call from a white female who had information concerning the suspect; the female was interviewed in person by Detective Armstrong; she revealed that an acquaintance of hers, Ricky Fugler, came to her residence between 1:30 and 2:00 a.m. on August 13, 1995, wearing a white t-shirt with cut-off sleeves and cut-off blue jeans; the defendant stated, "I fucked up, really fucked up," and sought permission to leave his vehicle, a 1994 GMC full sized, extended side-step pick-up truck, under the female's carport; the female asked Detective Armstrong whether the Officer had been shot with a .45 caliber weapon and informed him that Ricky Fugler habitually keeps such a weapon in his vehicle; the female also described Ricky Fugler as a twenty-three year old, white male, approximately 5'7" tall; when shown the composite of the suspect, the female stated that it "looked just like" Ricky Fugler, with the exception of the hair; affiant and other Baton Rouge Police Department personnel initiated a records check on the defendant and learned that, Ricky Joseph Fugler, white male, DOB 6/26/70, 5'8", resided at 5479 Summer Drive, Baton Rouge, Louisiana; the records check also revealed that Fugler's driver's license had been suspended and that he had two arrests for DWI; further, the records check revealed that Fugler was the owner of a 1994 blue GMC pickup, Louisiana plate S0368648; affiants were also able to locate a January 13, 1995, Baton Rouge Police Department report by Sergeant Kelly concerning Ricky Joseph Fugler's arrest for DWI; the report described Fugler as "combative and resistive" and indicated *21 that Fugler cursed the officer; further, the report revealed that a loaded .45 caliber weapon was on the front console of the defendant's vehicle, and that Sergeant Kelly had to pursue the defendant from the 3000 block of Perkins Road to the 2800 block of Morning Glory Avenue to complete the arrest; an inventory of the defendant's vehicle after the arrest revealed a 1911 Springfield Armory Semi-auto handgun with two magazines, each containing seven .45 caliber rounds of ammunition;[6] at approximately 9:00 a.m. on August 15, 1995, Officer Perry selected the defendant's photograph without hesitation as the person who shot him from a photo line-up of six photographs of white males with similar facial features; surveillance of 5429 Summer Drive on August 14, 1995, revealed the presence of a blue pick-up truck matching the description of the truck owned by Ricky Fugler; 5429 Summer Drive is listed in the Baton Rouge suburban directory as the residence of Ricky Joseph Fugler and the name "Fugler" is displayed on the house.
The trial court ruled, and we agree, that defendant's first alleged material omission was not a material omission and its inclusion would not have destroyed the court's finding of probable cause. The trial court noted that the affidavit was silent on whether or not the defendant was clean-shaven, but the wanted poster stated that the defendant was cleanshaven. Further, the testimony at the hearing on the motion did not establish that the police knew for a fact that the suspect was not clean-shaven at the time the affidavit was prepared. Lastly, the court noted that the defendant's photograph used in the photo line-up, in which he has a moustache, was not a photograph of him taken on the night in question.
This court notes that affiant, Detective Colter, explained that the reason the wanted poster stated that the suspect was cleanshaven was because "It's what we knew at the time."
The trial court next ruled, and we agree, that defendant's second alleged material omission was also not a material omission and its inclusion would not have destroyed the court's finding of probable cause. The court noted that the warrant did state that Officer Perry had viewed the photo line-up and identified the defendant as the man that shot him. Accordingly, the court held that any earlier statements given by Officer Perry concerning the defendant's hair were immaterial.
This court notes that any inconsistencies in the exact details of Officer Perry's description of his assailant were explained by the officer himself when he testified on the morning of August 13, 1995. When the descriptions were being prepared, he was still in pain and many people were questioning him concerning the suspect's clothing and hair. Officer Perry testified that the people had different descriptions and he was "correcting this person over here and that person." Officer Perry answered affirmatively when asked if he had described the suspect's hair as "collar length hair in the back, wavy or shaggy looking[.]" That description of the suspect's hair appeared on the wanted poster.
The trial court further ruled, and we agree, that defendant's third alleged material omission was neither omitted, nor material, and its inclusion did not destroy the court's finding of probable cause. The wanted poster contains the allegedly omitted description of the suspect's clothing. The court noted that at the time that it reviewed the affidavit, it also had before it the wanted poster and was aware of the discrepancy between the description of the suspect's clothes in both documents. The court found any discrepancies to be minor in light of the rest of the statements attributed to the caller. This court again references Officer Perry's explanation for inconsistencies in the exact details of his description of his assailant. Further, at the hearing on the instant motion, Officer Perry testified that he remembered his assailant wearing blue jeans.
In regard to the defendant's fourth alleged material omission, the trial court *22 found, and we agree, that the fact that two other witnesses identified someone other than the defendant from the photo line-up should have been presented to the court for consideration along with the other information in the affidavit. However, the trial court also found, and we agree, that the omission was not an intentional or deliberate attempt to conceal information that would indicate that there was not probable cause. The court noted that affiant Detective Moran had taken the statements from both of the witnesses at issue. Neither of the witnesses had reported the suspect as having a moustache, but both witnesses selected an individual from the photo line-up with a light moustache. Further, the court noted that both witnesses needed several minutes to make a selection from the photo line-up, whereas Officer Perry made an immediate identification. The court also noted the fact that, in their taped statements, neither of the witnesses could describe any of the suspect's facial characteristics. Further, one of the witnesses, Raymond Maxwell, specifically stated, "From the distance we was at, it was difficult for me to be able to see."
This court notes that a review of the taped statements reveals that these witnesses viewed the suspect as they drove by the crime scene in a moving vehicle. Further, at trial,[7] the other witness, Denise Haggard, stated that when shown the photo lineup, she was unable to make a definite identification of the suspect, and selected the photo she did because "[the suspect] could have looked like" the photo. Haggard admitted that she "never could really get a good look [at the suspect.]" When asked whether, based on what she saw, she excluded the defendant as being a possible person who was at the scene, Haggard answered negatively.
Similarly, at trial, Maxwell testified that in making his selection from the photo line-up, "I did my best from what I could recollect from the night prior and I chose one and did not feel comfortable with it." When asked whether, based upon his viewing the defendant in court, and based upon his memory of the incident, he felt that the State had the wrong person on trial, Maxwell answered negatively.
The trial court further ruled, and we agree, that defendant's fifth alleged material omission was neither omitted, nor material, and its inclusion did not destroy the court's finding of probable cause. Both the affidavit and the wanted poster describe the suspect truck as a blue, full-sized, step-side, GMC or Chevrolet pick-up truck. We have already discussed how the confusion over whether the suspect vehicle was a GMC or Chevrolet truck was perfectly understandable and certainly did not indicate unreliability. See discussion of reliability of Moore's out-of-court identification of the defendant and independent basis for her in-court identification, Manson factor three, above.
This assignment of error is without merit.

MOTION TO SUPPRESS CONFESSION
In assignment of error number 11, the defendant contends the trial court erred in refusing to suppress the statements he allegedly made to the Lusk brothers. He unsuccessfully argued below, and now argues here, that due to alcohol dependence and/or alcohol intoxication and/or alcoholic blackout, his statements were not knowing and voluntary. He expressly adopts the arguments urged under the sanity commission issue and further relies upon La. R.S. 15:451 and State v. Glover, 343 So.2d 118 (La.1976).
The admissibility of a confession or inculpatory statement is, in the first instance, a question for the trial court; its conclusions on the credibility and weight of the testimony relating to the voluntary nature of the confession or statement are accorded great weight and will not be overturned unless they are not supported by the evidence. Whether or not a showing of voluntariness has been made is analyzed on a case by case basis with regard to the facts and circumstances of each case. The trial *23 court must consider the totality of the circumstances in deciding whether or not a confession is admissible. State v. Neese, 96-1371, pp. 4-5 (La. 1st Cir.3/27/97), 691 So.2d 291, 293-294, writ denied, 97-1127 (La.10/17/97), 701 So.2d 1331.
When the free and voluntary nature of a confession or inculpatory statement is challenged on the ground that the defendant was intoxicated at the time of the confession, the confession will be inadmissible only when the intoxication is of such a degree as to negate the defendant's comprehension and to make him unconscious of the consequences of what he is saying. Whether intoxication exists, and is sufficient to vitiate the voluntariness of a confession, are questions of fact, and the trial court's ruling on this issue will not be disturbed unless unsupported by the evidence. State v. Williams, 602 So.2d 318, 319 (La.App. 1st Cir.), writ denied, 605 So.2d 1125 (La.1992).
In State v. Green, 94-0887, p. 8 at n. 7, (La.5/22/95), 655 So.2d 272, 279 at n. 7, contrary to the holding in Glover, the Louisiana Supreme Court recognized that an essential prerequisite for suppressing a confession or statement on voluntariness grounds under the due process clause of the United States Constitution's Fourteenth Amendment is misconduct or overreaching by the police. However, the Green court noted that the jurisprudence is confused as to whether, as a matter of Louisiana constitutional law, police misconduct or overreaching is required before a criminal defendant's confession or statement may be suppressed based upon involuntariness. Without resolving the issue, the Green court further noted that the Louisiana Fifth Circuit Court of Appeal in State v. Martin, 94-252 (La.App. 5th Cir.10/12/94), 645 So.2d 752, writ denied, 94-2787 (La.3/10/95), 650 So.2d 1174, seized upon La. R.S. 15:451 as an independent statutory ground, apart from the motion to suppress unconstitutionally obtained evidence provided for by La. Code Crim. P. art. 703, to exclude involuntary confessions made in the absence of police misconduct. In the instant case, it is undisputed that no police misconduct or overreaching was involved in the defendant's statements to the Lusk brothers shortly after the crime.
La. R.S. 15:451, provides:
Before what [purports] to be a confession can be introduced in evidence, it must be affirmatively shown that it was free and voluntary, and not made under the influence of fear, duress, intimidation, menaces, threats, inducements or promises.
As we previously noted in addressing the defendant's arguments concerning his motion for appointment of a sanity commission, the trial court, after reviewing the evidence and after listening to the testimony of the defendant's experts and the Lusk brothers, found as facts: (1) the defendant approached the Lusk brothers on the night of the crime with the intent to get or to seek their assistance in dismantling and disposing of evidence; and (2) the defendant had the mental capacity to proceed to and seek the assistance of the Lusk brothers, which "mitigates or goes against the idea of intoxication." The court expressed its "grave doubts" concerning the defendant's claims of lack of memory given to the doctors and found that those claims were "self-serving."
The trial court's above conclusions concerning the credibility and weight of the testimony pertinent to the instant argument are fully supported by the evidence, and thus, will not be overturned. The defendant acted with cunning and deliberation in approaching the Lusk brothers for assistance in disposing of the evidence of his crime in an attempt to escape responsibility for his crime. The defendant's actions surrounding his confessions/statements to the Lusk brothers demonstrate the knowing and voluntary nature of the confessions/statements.
This assignment of error is without merit.
SENTENCE AND CONVICTION AFFIRMED.
FITZSIMMONS and GUIDRY, JJ., concur and assign reasons.
FITZSIMMONS, Judge, concurring with reasons.
I respectfully concur in the result reached; however, I feel that the court must use caution *24 in its treatment of Brady challenges. The whole question of what is at issue in the trial of any citizen is not measured in hard and fast terms that contain legalisms. Rather the mark of our judicial system is that of "fairness." Unfortunately, that concept, and its true significance, is becoming clouded in a plethora of "standards" that seek to define a process.
In the matter sub judice, it is the existence of overwhelming evidence, i.e., the compelling testimony of the actual shooting, that supercedes the impact that Moore's reference might have had to the outcome of the trial. Thus, the conviction and sentence appear to be proper, based upon the specific facts in this case.
Yet, it would seem that many in our profession fail to understand the ebb and flow of a case being tried before a jury. The "opportunity" to "recall" a witness to cure a "problem" due to lack of disclosure by the opposing party does not correct the irreparable damage to the momentum of the presentation of a case. Sudden, belated revelations by the prosecutor can cause the rupture and rack of the defense's course of action, which thereby impede the very theory of the defense's case.
To be fair means to seek to excel in the quest to abide by the rule; it more fully inheres the intent that this concept called "fair" be honored. The implicit condonation, or apparent excusal, by the court of the prosecutor's failure to comply with the Brady requirements is somewhat disturbing to that sense of fairness.
GUIDRY, Judge, concurring.
I respectfully concur in the result reached; however, I join Judge Fitzsimmons in his concern with regard to Brady material and I add that I was also concerned about the seating of the victim at the counsel table throughout the trial. However, a careful review of the record in its entirety does not reveal error beyond a reasonable doubt. The record contains overwhelming evidence that supports the conviction and sentence in this case. Therefore, I respectfully concur.
NOTES
[1] Judge Remy Chiasson, retired, is serving as judge pro tempore by special appointment of the Louisiana Supreme Court.
[2] See Manson factor 3, below.
[3] Although at trial, Toby testified that the defendant "threw the gun out my window of the car[,]" at a pre-trial motions hearing he had testified that the defendant threw the gun out of the passenger's side window.
[4] Jury selection began on March 13, 1996. The presentation of evidence began on March 19, 1996.
[5] "It is a maxim not to be disregarded, that general expressions, in every opinion, are to be taken in connection with the case in which those expressions are used. If they go beyond the case, they may be respected, but ought not to control the judgment in a subsequent suit when the very point is presented for decision. The reason of this maxim is obvious. The question actually before the court is investigated with care and considered in its full extent. Other principles which may serve to illustrate it, are considered in their relation to the case decided, but their possible bearing on all other cases is seldom completely investigated." Cohens v. Virginia, 19 U.S. (6 Wheat.) 264, 399-400, 5 L.Ed. 257, 398 (1821).
[6] In a pre-trial ruling, the trial court held that Officer Kelly's testimony concerning his arrest of the defendant would not be admissible at trial. The court found that the evidence was speculative and that its prejudicial effect far outweighed its probative value.
[7] In determining whether or not a ruling on a motion to suppress was correct, this Court is not limited to the evidence adduced at the hearing on that motion. Instead, we will consider the record as a whole, including trial testimony. See State v. Young, 576 So.2d 1048, 1054 at n. 1 (La.App. 1st Cir.), writ denied, 584 So.2d 679 (La.1991).